## Case No. 6,020.

### HANEY et al. v. The LOUISIANA.

[6 Am. Law Reg. 422.]

District Court, D. Maryland. March Term, 1858.[1]

COLLISION—STEAMER AND SAILING VESSEL—MUTUAL FAULT—LOOK-OUT—RULES OF NAVIGATION.

1. Where a steamboat and sail vessel are approaching each other, and a collision takes place between them, if there is mutual fault, the loss that is occasioned must be divided.

2. A steamboat in the night time navigating the waters of a bay or river, must always have a look-out, who, for the time, has no other duty or occupation.

[Cited in The City of Washington, 92 U. S. 3.2.]

3. The rules of navigation, as settled in St. John v. Paine, 10 How. [51 U. S.] 583, The Genesee Chief, 12 How. [53 U. S.] 461, and The Oregon v. Rocca [18 How. (59 U. S.) 572], re-affirmed and acted upon.

[Libel in admiralty by Benjamin Haney, Charles Ogden, and John Trenchard, owners of the schooner Wm. K. Perrin, against the steamer Louisiana, and her captain, George W. Russell.]

GILES, District Judge. The libel in this case was filed to recover the value of the schooner Wm. K. Perrin, her cargo of oysters, and personal property on board, consisting of schooner's furniture, master's clothing, &c., amounting in all to between four and five thousand dollars. The schooner was sunk, with every thing on board, on the night of the 20th February last, in the Chesapeake Bay, in consequence of a collision with the steamer Louisiana.

The libellants, in their said libel, state that the collision occurred in the following manner: "That on Saturday, the 20th February, 1858, the said schooner sailed from Drum Point Harbor, in the Patuxent river; and between nine and ten o'clock that evening, while making her course down the Chesapeake Bay, about five miles below the Rappahannock light boat, she was run into by the steamer Louisiana, whose master the said George W. Russell then was; and that said schooner was so much injured that she sunk in three minutes, in deep water, and before any property could be saved from the vessel; and that the said collision was the result of no want of care, negligence, seamanship, prudence or precaution on the part of the said master or crew of the said schooner, but resulted altogether from the negligence, default, misconduct and wrong of the master and crew of the said steamer." And they proved, by the depositions of Isaac Matthews and Daniel B. Burrows, that the said schooner was two years old, and was worth at least $3,000; and that she would carry 200,000 oysters: 150,000 prime and 50,000 cullings. That the prime were worth $7 per thousand, and the cullings $3 per thousand; or by the

bushel the oysters were worth $1 per bushel. And by the testimony of Kelly and Coney, that she carried 1,200 bushels; and Coney also proved that her owners were to have one-third of the gross value of her cargo, and the remaining two-thirds, after deducting expenses, were to be divided as follows: one-third to the captain (Ogden), one-third to the mate, and one-third to himself. They also proved by William Miles, that he was mate on board the Wm. K. Perrin, at the time of the collision, and had hold of the tiller at the time; that he was steering a due south course; that when he first saw the steamer she bore from the schooner south half east, on the larboard bow; when the steamer came quite near, he discovered that she was going more to the west, and would come bows on to the schooner if some change of the course of the schooner was not made; that he immediately shoved his helm down, and called out to the men in the cabin to turn out; that the captain jumped up and got on the helm with him, but that within two seconds from the time he shoved his helm down, the steamer struck her, two feet aft the main rigging, and fifteen feet from the stern on the larboard quarter; and the schooner sunk immediately, hardly giving them time to save their lives by getting on board the steamer. That the schooner was going at the time about six knots per hour, and that Charles Corey was the only boy or person on deck with him at the time, and he was forward. That he believed if he had held on his course, and not ported his helm, the steamer would have struck the schooner bows on. They also proved by Charles Corey, that he was forward, on the larboard side of the said schooner, and when he saw the steamer she was about three-fourths of a mile distant, and to the leeward of them; thinks if they had held on their course the steamer would have run into them bows on, but that they might have cleared the steamer by putting up the schooner's helm; and that he called out to Miles to do so, but received from him no answer. Burrows, in his deposition, testified, that when he first saw the steamer from his vessel, she was four and a half miles ahead, and bore one point to leeward of his course; and at that time the schooner Wm. K. Perrin was about three-fourths of his (witness') schooner, and bore about a south-east course from it, and was distant from the steamer about three miles and a half.

The claimants, in their answer, allege, that on the night of the collision, the steamer Louisiana, being on her regular trip up the Chesapeake Bay, from Norfolk, in Virginia, to Baltimore, heading due north, descried said schooner at the distance of seven miles, standing down the bay, and holding a course nearly due south; at that time the schooner bore about two points to the east of north from the starboard bow of the steamer. It was the captain's watch on board the steam-

---

[1] [Reversed in Case No. 6,021.]

er; and the second mate, a skillful officer, was running the steamer, and was at his proper place in the wheelhouse, a position from which he had a full and perfect view ahead, and on both sides of the steamer. That Captain Russell was on the look-out, and several other persons were at the time on the deck of the steamer; and it was certain, from the course of the two vessels, that they would pass in safety at the distance of several hundred yards, if no change was made in the course of either vessel. That there was a pretty stiff breeze blowing at the time from N. N. West, so that the schooner had a free and fair wind. That when the schooner was within a hundred yards or thereabouts of being on a parallel line with the steamer, the schooner put her helm down, which turned the head of the schooner towards the western shore, and ran the schooner across the steamer's bows. The instant this unexpected movement was perceived, the wheel of the steamer was rapidly plied, so as to cause the steamer, as far as possible, to head towards the west, and at the same instant, orders were given to stop, and back the steamer. Both of which orders were promptly obeyed, but it was then impossible to prevent a collision. And that such a collision was the inevitable result of the change of the schooner's course. And the claimants proved by A. T. Ward, that he was the second mate and pilot of the steamer, and was on board, and in the pilot-house on the night of the collision; and a black man was at the wheel; the captain was on the deck. That he saw the schooner three or four miles off, and that she was then half point on the starboard bow of the steamer. When she got within 200 yards of the steamer she bore north by east on his starboard bow. In order to give plenty of room, he put the steamer's helm a-starboard, and held a course north by west. After he had done this, he discovered that the schooner had altered her course to the west, and was steering across the steamer's bows. That he then rang the gong and signaled the engineer to stop the steamer, and hove his wheel a-starboard to endeavor to come alongside of the schooner. That if the schooner had held on her course she would have passed two hundred yards to the east of the steamer. And that the schooner when she changed her course was about one hundred yards from the steamer. And by Mr. Rice, that he was on board the steamer on the night of the collision, and came on deck after the gong sounded, and that the schooner was then about seventy-five yards from the steamer, and was standing to the west, and seemed to be wavering in her course, as though no one was at the helm; and that the collision took place almost immediately afterwards.

I have thus given a brief outline of the allegations and testimony on either side; and as it frequently occurs in collision cases, there is a conflict as to the most important points in the case. But I am left without the advice and information of experienced nautical men to ascertain who was in fault on this occasion. This information from old and experienced ship-masters is always within the reach of the judges in the high court of admiralty in England, and who sit in that court as the "Trinity Masters." But in determining this question, I have to guide me, rules of navigation which have been recognized throughout the commercial world, and have been sanctioned and adopted by the supreme court. The first, and one of the most important of these rules of navigation (in reference to the large increase of vessels propelled by steam) is, that "when meeting a sailing vessel, whether close hauled or with the wind free, the latter has a right to keep her course; and it is the duty of the steamer to adopt such precaution as will avoid her." See St. John v. Paine, 10 How. [51 U. S.] 583. And that although just before a collision the master of a sailing vessel may have given an order or executed a change in the course of his vessel which was not judicious, yet this does not excuse the steamer, because it had the power to have passed at a safer distance, and had no right to place a sailing vessel in such jeopardy that the error of a moment might cause her destruction. See the case of The Genesee Chief, 12 How. [53 U. S.] 461. Another of these rules is, that when two vessels, either steam or sailing vessels, are approaching each other on parallel lines, or nearly parallel, in opposite tacks, each vessel must, if there be danger of a collision, put their helms to port, and pass on the larboard side of each other; and that this rule prevails when a steamer is meeting a sailing vessel in all cases, except where the sailing vessel is so far on the starboard bow of the steamer that its observance would, instead of avoiding, tend to bring about a collision, by causing the steamer to cross the bows of the sailing vessel. See the case of The Rose, 2 W. Rob. Adm. 4; Wheeler v. The Eastern State [Case No. 17,494]; The Oregon v. Rocca, 18 How. [59 U. S.] 572; St. John v. Paine, 10 How. [51 U. S.] 584.

Now, in this case it is by no means clear, from the evidence, that if the schooner's course had not been changed a few seconds before the collision, that it would not have taken place. I think, therefore, that the steamer was wrong, when she had such wide waters around her, in running so close to the schooner, that if she had not changed her course, the steamer must have passed within a hundred yards of her, if not over her, as two of the witnesses believed. I think the steamer was also wrong in attempting to pass to the west, or on the starboard side of the schooner; for, although it may be as the pilot, Ward, testified, that the schooner was half or one point on the starboard bow of the steamer, yet the steamer should have ported her helm and passed on the larboard side of the schooner. For, if this rule of

navigation be strictly enforced and generally acted on, every vessel can govern itself accordingly when approaching another, and many disastrous collisions may be avoided. I think also, there was gross want of skill and proper caution on the part of Miles, who was at the helm of the schooner at the time of the collision. According to his own testimony he saw the steamer was "westing on him," (to use his own language) and knew that her speed was more than double that of the schooner, and when within one hundred yards of the steamer he attempted to go to the west of her, instead of putting his helm up and going to the east, which according to Corey's testimony should have been done, and would have avoided the collision; and this, too, after Corey, who was on the lookout on the schooner, had called to him to put his helm up. This, then, makes a case of mutual fault, and I shall decide the loss as the supreme court did in the cases of The Catharine v. Dickerson, 17 How. [58 U. S.] 176; Rogers v. The St. Charles, 19 How. [60 U. S.] 108.

Before passing from this case, I would remark that if this collision had occurred without the schooner having been seen by persons on board the steamer until it was too late to avoid it, it would have been my duty to have decided the case against the steamer, without inquiring into any other circumstance of the collision. And for the reason, that on the night in question, the steamer had no proper look-out; for the pilot, Ward, testified that he was on the look-out. And the supreme court have again and again decided that a look-out must be one exclusively employed in watching the movements of vessels which they are meeting, or about to pass; and must have for the time no other occupation or duty. See [The Genesee Chief v. Fitzhugh] 12 How. [53 U. S.] 462; [St. John v. Paine] 10 How. [51 U. S.] 585; and [The New York v. Rae] 18 How. [59 U. S.] 225. I am surprised that this steamer, that has been so well managed in all that pertains to the comfort and convenience of her passengers, and has gained so large a share of public confidence, should be found running on this occasion without such a look-out on deck.

[See Case No. 6,021.]