## Case No. 2,129.

### BULLOCH v. The LAMAR.

[1 West. Law J. 444; 8 Law Rep. 275.]

Circuit Court, D. Georgia. May Term, 1844.

ADMIRALTY JURISDICTION — SAVANNAH RIVER — COLLISION—INSUFFICIENT LIGHTS.

1. Admiralty jurisdiction extends over the Savannah river, between Savannah and Au-

gusta, where the tide ebbs and flows, although within the body of a county.

[Cited in The Lotty, Case No. 8,524. Disapproved in Waring v. Clarke, 5 How. (46 U. S.) 487.]

2. It is a neglect of proper precaution to put a steamboat under full headway, just as she is entering a narrow part of the channel in the night. It is also a neglect of proper precaution for a steamboat not to have a signal light in the night. And if damage ensues, in either of these cases, not caused by the neglect of the injured party, the party neglecting such proper precautions is liable.

[Cited in The Santa Claus, Case No. 12,327; The Rhode Island, Id. 11,745; The Bay State, Id. 1,148; Jones v. The Hanover, Id. 7,466; The Indiana, Id. 7,020; Ward v. The Fashion, Id. 17,154; The Rocket, Id. 11,-975; The City of Washington v. Baillie, 92 U. S. 36.]

[Appeal from the district court of the United States for the district of Georgia.

[In admiralty. Libel by William W. Bulloch against the steamer Lamar to recover damages for the loss of two negro slaves by collision. The bill was dismissed in the district court (case not reported), and libellant appealed. Reversed, and decree entered for libellant.]

WAYNE, Circuit Justice. The libellant seeks to recover compensation for two negroes, who were his property, and who were drowned, the canoe in which they were, having been run under by the steamer Lamar, in tide water, in the Savannah river. He alleges, that the negroes were going in a staunch, well built, and safe boat from the city of Savannah to his plantation. That, as they were on the way up the river, it being about eight o'clock and bright moon light, the steamboat Lamar, with two towboats attached to her, and with a strong current, ran with great violence and force against the canoe, sunk her, and that the negro slaves, Mary and Andrew, the property of the libellant, were drowned. That when the collision happened, it was impossible for the negroes in the canoe to get out of the way of the Lamar, on account of the rapidity with which she approached, and the space occupied by her and the freight boats, one of them being on the starboard, and the other on the larboard side, but that there was ample time for the Lamar to have been stopped, and so have avoided a collision with the canoe, if the master of the steamer had not refused, or at least neglected to keep clear of it, which might with care and safety have been done.

The respondents answer, that the accident occurred in the river Savannah, about three miles above the city, the Lamar being on her way from Savannah to Augusta, being the trade in which she is habitually employed, and being interior navigation. The jurisdiction of the court is then denied. The correctness of the statement, as made in the libel, is also denied, and the respondents proceed to state, that the Lamar, being well equipped

---

[1] [Reported by Samuel H. Hempstead, Esq.]

and manned, started from Savannah for Augusta, that after passing a shoal in the river, which required the progress of the steamer to be checked, her steam was again put on, and she was proceeding under her usual pressure, but without having attained her usual speed. That she was nearly under her usual headway, and had reached the Georgia shore, following the channel of the river in the track of steamboats, having two boats attached to her; that after she had made an oblique passage across the river, from the shoal towards the shore, she was straitened up the river; that at this time, it being dark, and no moon up, an alarm was given by a hand in the inner flat, or towboat; that the master of the Lamar immediately ordered her to be stopped, which was done; that it was then ascertained, a canoe had been run over by the inner boat; that at the time of the accident it was dark, that there was no moon, that the canoe was not seen, and could not be seen in time to prevent the accident; that as soon as the alarm was given, every exertion was made to stop the boat instantly; that the accident was not occasioned by the negligence, want of care or skill of the master or crew of the steamer; but if there was negligence, it was that of the negroes in the canoe, in not keeping nearer the shore, and out of the reach of the steamer, as they must have heard her approach, some time before she reached them. From the answer it is conceded that a canoe was run down by the Lamar, at the time stated, in tide water, in Savannah river, and that the canoe and Lamar, were both going up the river with the flood tide. The evidence establishes that two negroes, belonging to the libellant, were in the canoe when she was run under. That the canoe was a safe, well built boat, not overloaded, was paddled by an able man in a fit condition to manage her; that he and the woman with him were drowned, by the canoe having been run under by the inner or larboard towboat attached to the Lamar; and that they were worth one thousand dollars. It appears also that the captain of the Lamar, was in his place on board of her, on the look out when the alarm was given, that he instantly gave orders to stop her, which was done, and that after the canoe was run under, he did all that could be done under the circumstances, to ascertain the extent of injury which had occurred, and to save the lives of those who might have been on board the canoe, if any such hope could be indulged in a case in which a boat had been run under, passing a distance of more than one hundred feet, under the bow of the tow boat, out at her stern, before she was seen again.

The point then in the case is, was the canoe run down, by such negligence, want of skill, or carelessness in the navigation and management of the Lamar, as to entitle the libellant to recover compensation from her owners, for the loss which he has sustained.

To recover, the libellant must prove not only negligence upon the part of the respondent, but ordinary care on his own part. Lane v. Crombie, 12 Pick. 177. But, if the evidence discloses that the captain of the Lamar had neglected an ordinary or proper measure of prevention, then the burthen of proof is thrown upon the respondents, to shew, that the collision was not owing to such neglect. Clapp v. Young [Case No. 2,786]. In all cases of collision then, the essential enquiry is, whether proper measures of precaution have been taken by the vessel which runs down another. With these principles in view, what are the legal consequences of the evidence in this case? It will be viewed in two ways. Does it shew that the libellant has complied with the first requirement mentioned, to enable him to recover? Did the captain of the Lamar neglect a proper measure of prevention, and have the respondents shewn that the collision was not owing to that neglect. Both depend upon the testimony of the captain and mate of the Lamar, of Captain Nock, of the steamer Santee, and J. E. Dillon. Captain Cresswell, and Adams, his mate, agree in their statement of all the facts which bear upon the enquiry. They concur in the time when the Lamar, with a towboat on each side of her, left Savannah. It was in the evening, after or about six o'clock, in October. When the Lamar reached McGilvry's bar, between two and three miles from Savannah, the steam "was checked down," that the boat might go slow, as the water was shallow on the bar. The channel over the bar runs in an oblique direction, towards the Georgia shore, close to it. When the Lamar, following the channel, had crossed the bar, the captain called for headway. The Lamar was put under her customary pressure of steam, and straitened up the river in the channel, which commences to "run jam in" at the place where the Iron Steamboat Company repair their flats, and runs up above McAlpin's brick yard. In two minutes, after the order was given for headway, the canoe was run under. It happened, according to the precise statement of Adams, not more than twenty-five or thirty feet from Stiles' landing, or sunken flats. This, he says, "is the point where the accident occurred.—Here there was a thick verdure of trees, and in the back ground a brick kiln. It was very dark in consequence of the shade of the trees, which was not penetrated by the moon." Captain Nock says: "The channel of the river between the place where the Iron Steamboat Company repair their boats and Stiles' landing, runs close to the landing as a steamboat can go, to keep her clear of some sunken flats which adjoin Stiles, which form part of the landing; that between the two points referred to, at a half or two-thirds flood, two steamboats might possibly pass each other; one of the boats might possibly have to run ashore; between those points the bank is very high

and well shaded by trees on the main Georgia side, and it is a very dark part of the river. It is considered a very bad part of the river on account of the trees, which throw a shade out and make the river dark. This darkness commences when you run to the bank and continues until you get up to McAlpin's foundry." J. E. Dillon says: "From where the Iron Steamboat Company repair their flats to Stiles' wharf, the channel runs as close to the shore as you can conveniently get, but nearer opposite Stiles' landing than lower down. Two boats, with their towboats, might pass each other at any spot between those two places at half tide. He had rather be in any other part of the river in tide way at night; considers the passage along Rabbit island and the main land as the most difficult in tide way."

Such is the description of the locality where the canoe was run under, and of the channel and its condition at night, from the place of its beginning below, to its termination at McAlpin's foundry. Captain Cresswell, as far as he knows, concurs in it, and confirms the account of its darkness at night from the shade of the trees on the bank of the river. He was himself familiar with it, and so was his mate, from having been for a long time navigating the river. The channel is not over one hundred and fifty feet wide. We all know it to be a great thoroughfare for the thousands who live upon the island, and on the banks of the river, in South Carolina and Georgia. The convenience, interest, and necessities of planters, for twenty miles up the river, require them to use this channel by night and by day, with all kinds of plantation boats. It is travelled for much the larger part of the year, and particularly in our business season, by ocean and by river craft, both by night and by day, and it is the only pass for steamboats from, and in passing by the city to Augusta. Can that then be considered a judicious and careful order, for her own safety, without any reference to the safety of others, which directs a steamer to be put under headway, under her usual pressure of steam, just at the moment she is entering such a pass at night, without moon enough to give her light, with a towboat on each side, covering more than half the width of the channel? But when viewed with reference to the safety of others, who may be in the same place, on their way up or down the river, and in connexion with the power and rapid course of steamboats, and the swell made by them in their passage through the water, does not such an order indicate great thoughtlessness and gross neglect? Shall a steamboat, with or without towboats, but particularly with towboats attached to her sides, be permitted, either in the day or night, but especially at night, to run the whole length, or any part of this channel, under her usual press of steam, without being answerable for the injury she may do, unless it shall clearly appear that the sufferer was also in fault. A little of the care which was used to carry the Lamar in safety over McGilvry's bar would have prevented the collision. Its discontinuance at the moment of calling for headway, shows, that a proper regard for the interests and safety of others was not comprehended in that consideration, which suggested care for the Lamar and her towboats as they were passing the bar. A stronger cause, in fact, called for greater care and a slower progress. In passing the bar, objects could be seen at a distance from the forward deck of the Lamar. At the upper termination of the bar on the Georgia shore, the channel began to be obscured by the shade of trees, and was then so much darkened, that, Captain Cresswell says, objects could not be seen close in shore, and that he did not see the canoe which was run under, though he was in his place on the look out, until he was within ten feet of her; too near for him, by any order which he could give, driven on as the Lamar was by flood and steam, to prevent the disaster. He says the night was clear, and when headway was called for, and the Lamar was straitened up the channel, he could see half a mile ahead. The sudden change from a locality where he could see so well, into another, in which he could not distinguish a boat until she was within ten feet of his vessel, and then not clearly enough to tell whether there were persons in the canoe, should have admonished him "to check his steam down again." He says, at the time the towboat came in contact with the canoe, that the Lamar was under a full headway. The mate thinks she was not, but was going fast with the flood tide. It matters not, whether the Lamar had or had not attained her full speed. The carelessness was in giving an order for headway and placing the boat under her usual press of steam, when she was in such a position.—Under this careless order, she had attained a speed fast enough for her to overtake and run under, a canoe which was also going up the river with the flood tide. The order caused the mischief, unless it can be shewn that the canoe was carelessly managed in some way or other, so as to make those in charge of her parties in fault. As to this point Captain Cresswell says, when the alarm was given he cast his eye on shore and saw something between the steamboat and the shore apparently crossing the bow of the boat. This is not the language of positive testimony, and is unlike the general positiveness of the witness in the rest of his evidence. Nor is it consistent with the position in which he first saw the canoe, about ten feet off, and her being between the steamboat and the shore. The canoe could not have been in both of these positions at the same time. But I do not mean to be understood from what I have just said, as reflecting, in any way, upon the veracity of Captain Cresswell. I believe he tells the truth, and what he believed to be the truth,

when he first saw the canoe; but I still be-
live, and will shew, that the canoe was not,
at the time of the contact, in the act of cross-
ing the bow of the boat, though she might
have had that appearance from where Cap-
tain Cresswell stood, supposing him to have
been no way disconcerted, by the apprehen-
sion of the disaster which was about to oc-
cur. Dillon's testimony explains it. At the
point where Adams says the canoe was run
under, which was within thirty feet of Stiles'
landing, Dillon says the channel there is
nearer than lower down. The Lamar had
crossed McGilvry's bar obliquely to the Geor-
gia shore—she was then straitened up the
channel, which does not run so close to the
shore as at Stiles' landing, and in making
her approach to it, she ran closer in, which
would give, if her head was in any way
turned towards the shore or channel at
Stiles' landing, the appearance to the canoe,
of crossing the bow of the boat if she was
thirty feet or more from the landing, as the
evidence shews that she was. It is reason-
able also to conclude, that she was so far out
that she might have, as she had a right to
use it, the strength of the flood tide to aid
her along. Captain Cresswell is the only
witness who states the position of the canoe
when first seen, and at the time of the con-
tact immediately after.—His evidence has
been stated as it was given by him, and with
or without the explanation afforded by Dil-
lon's testimony, it does not show that the ca-
noe was in the act of crossing the bow of the
boat which ran her down.

I have said that the order for headway
caused the disaster, and that it amounted to
gross neglect of what ought to have been
done, to put a steamboat under headway un-
der her usual press of steam, just as she was
entering such a channel as this is, and at the
time when it was done, at night. The law
holds the owners of steamboats answerable
for losses occasioned by collision, if they are
running under their usual press of steam,
when from any cause, objects cannot be seen
at the distance they commonly can be in
clear weather, unless the sufferer is also in
fault. It has been adjudged that a steam-
boat, going at her usual rate of speed in a
fog, and coming in contact with another boat
not in fault, shall pay the loss; and this
when the steamer was in an open stream,
without any of the difficulties of a narrow
channel, close in shore.—"Every boat navi-
gating the river is bound to make use of all
reasonable precautions to avoid injuring oth-
ers, which precautions may vary with cir-
cumstances. In a fog, for example, a steam-
boat ought not to run at her full speed, if by
so doing she increases the danger to other
craft; for she must regard their safety as
well as her own." Lawrence v. Jones, 1
West. Law J. 28. If responsible in such a
case, why not in a case of running at night,
under the usual press of steam, in a narrow
and difficult channel, close in shore darkened

by the shade of trees; so much so, that ob-
jects cannot be seen at the same distance
that they may be of a clear night on the wa-
ter. Again.—Suppose this had not been a
case of collision, but one of the canoe having
been swamped by the swell made by the
steamer, by a too rapid rate of going—the
swamping being produced by the swell alone,
the steamer would have been responsible for
the loss. Luxford v. Large, 5 Car. & P. 421.
Such cases illustrate that kind of care which
the law requires to be taken by those in the
command of steamboats to exempt them from
responsibility to make compensation for loss-
es, sustained by the want of it. It is a mistake
that a steamer, because she is going at her
usual rate, may not be answerable for losses
caused by that speed. The law looks upon
them as vessels so much under command
from their improved enginery, that those in
charge of them are bound to regulate their
speed, according to circumstances, in such a
way, that they may not alarm and annoy
others, or endanger the lives and property of
others, navigating the same waters.

It having been determined, that the order
for headway, and the boat being put under
her usual press of steam, was gross negli-
gence, in the then condition of the boat, the
remaining enquiry under this head of the in-
vestigation, is, were those in the canoe in
fault at all, and has not the libellant shown,
on his part, ordinary care? The only fault
suggested by any witness, is that of the cap-
tain—that when he first saw the canoe, she
had the appearance of being then crossing
the bow of the boat. That has already been
disposed of. And I think the facts that the
canoe was a safe, well built boat—that she
was not overloaded, was manned by a per-
son able to manage her, and in a condition
to do so, and that when she was run under
she was in her proper channel, show the or-
dinary care required by the rule, from the li-
bellant, and that in connexion with the neg-
lect or want of skill in giving the order for
headway, he is entitled to recover compensa-
tion. I do not apprehend, when the local-
ity of the Lamar at the time of the disaster
is understood, that there will be any dis-
agreement as to the unskillfulness of the or-
der which was given but two minutes be-
fore for headway, or that there can be any
dissent from the conclusion, that the re-
spondents should make to the libellant full
compensation for his loss. If, however,
there had been no evidence in the case to
bring me to the result just stated, there is
a fact disclosed in the testimony of Captain
Cresswell, which, in the absence of all proof
on the part of the respondents, that this col-
lision was not owing to it, would force from
me the same judgment that I have given.
Captain Cresswell says, "he had no lights
ahead of his boat, and never carries any, as
he can't see if he carries lights." Now, be-
sides the triflingness of such a reason for
not carrying lights, as if lights might not be

so placed as not to interfere with the sight of those navigating steamers—the act of congress of the 7th of June, 1838 [5 Stat. 306], 10th section, declares "that it shall be the duty of every master and owner of every steamboat running between sunset and sunrise, to carry one or more signal lights, that may be seen by other boats navigating the same waters, under the penalty of two hundred dollars." This requirement applies to all steam vesels, whatever waters they may navigate, as much so as the obligation upon them, imposed by the same law, to have an annual inspection of their hulls, machinery, and boilers, before it shall be lawful for them to transport goods, wares, and merchandise, or passengers, upon the bays, lakes, rivers or other navigable waters of the United States. Not carrying one or more signal lights, then, in the way required, is the neglect of a proper precaution conducing to the safety of others. Besides subjecting the captains and owners to the penalty of two hundred dollars, which may be recovered by suit or indictment, it will throw upon the owners of steamboats the burthen of proof, to show that collisions which may occur, under such circumstances, are not owing to such neglect. I would require from them the same proofs, under like circumstances, in the case of a boat being swamped by the swell of a steamer, made by her rapid passage through the water. The requirement of the statute is reasonable—it can easily be complied with—the neglect of it cannot be permitted to pass with impunity. In the case under consideration an attempt is made to attribute the collision to the neglect of the negroes in not keeping out of the track of the steamer, as the noise made by her approach must have been heard by them. Besides such a suggestion being inconsistent with the slow passage of the steamer over McGilvry's bar, "with the steam checked down," how much better it might have been, if those who lost their lives had had the advantage of the signal lights, commanded by law. In this case, the law was disobeyed by the neglect of a proper prevention, and as the respondents have given no proof that the collision was not owing to such neglect, my judgment is, that they are bound to make full compensation to the libellant for the loss he has sustained, and I shall decree so accordingly.

But, it was urged, in argument, that the court had no jurisdiction, in this case, because the Lamar was engaged in an interior trade, from Savannah to Augusta; and, also, that the admiralty jurisdiction did not attach in cases of loss and injuries happening within the ebb and flow of the tide, within the body of a county. In practice. I may say, since courts were organized under the constitution, the admiralty jurisdiction has been maintained in cases of collision upon the high seas, and in ports and harbors, within the ebb and flow of the tide, without any reference to the vessel, injured or injuring another, being engaged in navigating the ocean, or between places within the ebb and flow of the tide. The locality of the collision, being within the ebb and flow of the tide, gives jurisdiction in admiralty. The general admiralty jurisdiction of the courts in tide water is affirmed in the case of Peyroux v. Howard, 7 Pet. [32 U. S.] 324; other cases decided in the supreme court affirm the same doctrine. It is not an open question. I do not mean, however, to assert that the grant of admiralty power, in the constitution, is limited to the ebb and flow of the tide—that admiralty jurisdiction may not be maintained under the judicial act, as it is, above the flow of tide, or that congress may not legislate to give such jurisdiction upon navigable waters, beyond the ebb and flow of the tide, and upon our great inland seas. It may be done without making any encroachment upon the trial by jury, in the legitimate use of that institution. I do not say, it must be so done. I am aware of the case of The Thomas Jefferson, in 10 Wheat. [23 U. S.] 428. It is authority, and I am bound by it; but I am not committed upon any of the points just suggested, nor to any interpretation which has been made of the grant of admiralty power in the constitution, which gives a standard by which its jurisdiction is to be measured. The case here under consideration does not properly present the occasion for the discussion of the subject. I have a case before me, in which it may be necessary to be done. If so, it shall be. It is enough for the present, that I am satisfied the court has jurisdiction in this case. I shall direct a decree to be entered reversing the decree of the district court, and directing that the libellant shall recover one thousand dollars, and that the respondents shall pay all costs.