92 U.S. 31
 23 L.Ed. 600
 THE 'COTY OF WASHINGTON.'
 October Term, 1875
 
 APPEAL from the Circuit Court of the United States for the Eastern District of New York.
 Mr. James W. Gerard for the appellants.
 Mr. Henry J. Scudder for the appellees.
 MR. JUSTICE CLIFFORD delivered the opinion of the court.
 
 
 1
 Usages, called sea laws, having the effect of obligatory regulations, to prevent collisions between ships engaged in navigation, existed long before there was any legislation upon the subject, either in this country or in the country from which our judicial system was largely borrowed.
 
 
 2
 Plenary jurisdiction was conferred upon the courts in such controversies; and the judicial reports show, beyond peradventure, that the courts, both common-law and admiralty, were constantly in the habit of referring to the established usages of the sea as furnishing the rule of decision to determine whether any fault of navigation was committed in the particular case; and, if so, which of the parties, if either, was responsible for the consequences.
 
 
 3
 Examples of the kind are quite too numerous for citation, and they are amply sufficient to prove that the usages of the sea, antecedent to the enactment of sailing rules, constituted the principal source from which the rules of decision, in such controversies, were drawn by the courts of admiralty and all the best writers upon the subject of admiralty law. Maclachlan on Ship., 2d ed., 280; Williams & Bruce's Prac., pp. 4, 15.
 
 
 4
 Sailing rules and other regulations have since been enacted; and it is everywhere admitted that such rules and regulations, in cases where they apply, furnish the paramount rule of decision; but it is well known that questions often arise in such litigations, outside of the scope and operation of the legislative enactments. Safe guides, in such cases, are often found in the decisions of the courts, or in the views of standard text-writers: but it is competent for the court, in such a case, to admit evidence of usage; and, if it be proved that the matter is regulated by a general usage, such evidence may furnish a safe guide as the proper rule of decision.
 
 
 5
 Compensatory damages are claimed by the libellants for the value of the schooner 'John D. Jones,' employed as a pilot-boat, which it appears was sunk and became a total loss in a collision that occurred on the 28th of March, 1871, between the schooner and the steamship 'City of Washington,' the latter being on her return voyage from Europe to the port of New York. Just prior to the collision, it appears that the schooner was lying-to, some two hundred miles off Sandy Hook, with her helm lashed on her starboard tack, and with her jib-sheet to the windward. While lying in that condition, the wind being north-west by north, a light was reported bearing from the schooner south by east, off the port quarter of the schooner. It appears that the schooner was a pilot-boat, with foresail, mainsail, and jib; and that her sails, except the jib-sheet, were closely reefed, as she was waiting for employment as a pilot-boat. Seeing the light, the first act of those in charge of her navigation was to give sail, put up her helm, and let her fall off; and in the mean time they showed her flash-light, that the approaching vessel might know that the schooner was a pilot-boat waiting for employment.
 
 
 6
 Such lights are shown, under such circumstances, to disclose the special character of the vessel; and the evidence shows that the approaching vessel immediately displayed a blue light, which is the proper signal to show to a pilot-boat to signify that the light of the pilot-boat is seen, and that her services as such are wanted. Such a signal shows that the flash-light is seen, that the character of the boat displaying the same is known, and that the vessel displaying the blue light is coming up to secure a pilot.
 
 
 7
 When the master of the schooner first discerned the blue light of the approaching vessel, the schooner bore from the blue light, about west by north, as near as those in charge of the schooner could judge. Enough appears to warrant the conclusion that the schooner kept her course to the southward and westward, and that those in charge of her very soon discovered the signal-lights of the approaching vessel. Beyond doubt, they first made the green light; but it appears, that, shortly after that, they made all three of the approaching signal-lights, and became convinced that it was a steamship heading directly towards the schooner for the purpose of securing the assistance of a pilot. Pursuant to that obvious purpose, the steamship continued to keep that course until she got within about a quarter of a mile of the schooner, when she ported her helm, the effect of which was to close her green light, and to show her red light and masthead-light, indicating that the steamship would cross the stern of the schooner.
 
 
 8
 Considerable change must have been made in the course of the steamship, as the master of the schooner testifies that he could even see the glimmerings of the side-lights of the windows on the side of the vessel, showing that she was crossing the stern of the schooner. Throughout this period the evidence shows that those in charge of the schooner continued to show the flash-light to indicate their position and the course of the schooner.
 
 
 9
 Both parties concede that the wind was north-west by north; and it follows that the change in the course of the steamship, effected by porting her helm, was to constitute the starboard side of the vessel her lee side, which is the side where a pilot properly goes on board. With that object in view the schooner continued her course, constantly showing the flash-light, until the two vessels were within five or six lengths of each other, when the schooner launched her yawl, manned by a pilot and two seamen, whose destination was to the lee side of the steamship. It appears that the yawl carried a light, and that she headed for the light hung over the lee side of the steamship to indicate the place where the pilot might ascend the stairs and go on board the approaching steamship.
 
 
 10
 All agree, it is presumed, that the preparations to send the pilot on board were judicious and proper, except that the owners of the steamship insist that the schooner was not in a proper position when those in charge of her launched the yawl and despatched the pilot, as requested by the customary signal from the steamship. Signals of the kind, it is admitted, were given; and the master of the schooner testifies that the schooner, at the time she launched the yawl, was crossing the bows of the steamship, and that the steamship, before the yawl reached her destination, starboarded her helm, and changed her course, so that she headed directly towards the schooner.
 
 
 11
 Nothing could have been more injudicious, as the two vessels were then close together; and it appears that the steamship was still under considerable headway, and that she struck the schooner on her port side just abaft the mainmast, cutting five or six feet into the hull of the vessel. Convincing proof is also exhibited that the steamship approached the schooner at an obtuse angle towards the stem; that her bowsprit hit the mainmast of the schooner, and broke it into three pieces; that the concussion of the two vessels careened the schooner over, so that the water flowed down the weather-hatches; and that the master was knocked overboard by the falling spar. Immediate assistance was furnished, and he was rescued from danger but the schooner sank in less than fifteen minutes.
 
 
 12
 Service was made, and the owners of the steamship appeared and filed an answer. Testimony was taken; and the District Court, having first heard the parties, entered a decree in favor of the libellants for the value of the schooner. No question being made as to the amount awarded, it is not necessary to refer to the proceedings before the master. Appeal was taken by the respondents to the Circuit Court, where the parties were again heard; and the Circuit Court affirmed the decree of the District Court. Still dissatisfied, the respondents removed the case into this court for re-examination.
 
 
 13
 Sufficient appears, in the statement of facts exhibited in the preliminary summary of the evidence, to show that the steamship was proceeding westward to her port of destination, and that the schooner, though lying-to when the light of the steamship first became visible, was, in fact, on a cruise in pursuit of employment as a pilot-boat. Pilot-boats, it should be remarked, are required to carry a masthead-light; and the evidence shows that the schooner did not display any such light, as prescribed by the rules of navigation. 13 Stat. 59.
 
 
 14
 Flash-lights were constantly exhibited by the schooner; and it is fully proved that the steamship showed, in reply, a blue light, to signify that the flash-light was seen, and that a pilot was wanted. These signals having been exchanged, the steamship altered her course to north-west by north, which was a proper manoeuvre to meet the schooner; and it appears that the schooner bore away to the southward and westward for the reciprocal purpose of meeting the steamship, to comply with her request for a pilot.
 
 
 15
 Apparently, each understood the purpose and intent of the other; nor are any remarks necessary to show that the course adopted by the respective vessels, if pursued for any considerable distance, would cross each other as the vessels advanced; and the proofs show, that, when they had approached within a quarter of a mile of each other, the steamship ported her helm sufficiently to make her starboard side her lee side, and that those in charge of her navigation showed a light over her lee side to guide the pilot as to the place where he should board the steamship. Pursuant to that signal, the schooner, as she was crossing the bow of the steamship, launched the yawl, as before explained, and despatched the pilot for the steamship.
 
 
 16
 Complete success attended the launching of the yawl; and it appears that the pilot, aided by two seamen, rowed the yawl directly for the light suspended over the lee side of the steamship. Equipped as the yawl was with a good light, it was the duty of those in charge of the steamship's navigation to make the necessary preparations to receive the pilot on board: but, before he had time to reach the point of destination in the yawl, the steamship starboarded her helm; and, failing to stop, she advanced and struck the schooner in the manner antecedently described, injuring her to such an extent that she sank, and became a total loss.
 
 
 17
 Two faults are charged against the steamship: (1.) That she starboarded her helm, which is admitted; and of course it requires no argument to establish the charge. (2.) That she did not stop, so as to give the schooner the opportunity to send a pilot on board, without being run down while endeavoring to perform that duty.
 
 
 18
 Argument to show that the faults imputed to the steamship, if proved, were culpable faults, is hardly necessary, as it is clear that each tended, beyond all doubt, to promote the collision. Discussion as to the first charge is unnecessary, as it is admitted; and the evidence to prove the other is too decisive to require comment, when considered in connection with the effects produced by the concussion.
 
 
 19
 Suppose that is so: still it is insisted by the respondents that the schooner was also in fault; and they make two charges against the schooner, which are the only questions that remain to be considered. They are as follows: (1.) That the schooner did not show any masthead-light. (2.) That she was guilty of negligence in attempting to cross the bows of the steamship.
 
 
 20
 Masthead-lights should be displayed by pilot-boats in such a case; and it follows that such an omission of duty casts upon the schooner the burden of proving that the omission in that regard did not occasion or contribute to the collision. The Farragut, 10 Wall. 338; The Miranda, 6 McLean, 221; Bulloch v. Lamar, 8 Law Rep. 275; The Louisiana, 6 Am. Law Reg. 422; 1 Pars. on Ship. 577, 595; Waring v. Clark, 5 How. 465; The Vanderbilt, 16 Conn. 420.
 
 
 21
 Lights of the kind are required as one of many precautions which prudent navigators are expected to provide; but it would be unreasonable to hold that the owners of a pilot-vessel should be adjudged liable for the consequences of a collision by reason of not having a masthead-light, where it appeared, beyond all doubt, that she constantly showed flash-lights, which were seasonably seen by the other vessel, and that the absence of the masthead-light had nothing to do with the collision. The Panther, Spink's Adm. 31; Morrison v. Nav. Co., Exch. 733.
 
 
 22
 Sailing pilot-boats are required to carry the masthead-light, besides displaying the flare-up light, in order that they may be seen by approaching vessels, and that the approaching vessel may not be misled in respect to the character of the vessel showing such a light. The Trident, Spink's Adm. 223; The Telegraph, id. 431.
 
 
 23
 Clear proof is exhibited that the schooner did not carry the required masthead-light; but it is equally clear that she was seasonably seen by the steamship, and that those in charge of the navigation of the steamship were not misled, even for a moment, as to the character of the schooner. The Livingstone, Swabey, 520. Instead of that, the evidence is full to the point that they immediately replied to the signal of the flash-light by showing the blue light, and in due season showed the lee side of the ship, and lowered a light over the rail on that side as a signal to the pilot to approach the ship at that point, in order to come on board.
 
 
 24
 Proof more satisfactory than what is given in this case cannot be required to show that the absence of the masthead-light did not contribute in any degree to the collision. Such an omission to comply with the rules of navigation, where it clearly appears that it had nothing to do with the disaster, is not sufficient to exonerate the culpable party from any portion of the damages.
 
 
 25
 Grant all that, and still it is contended by the respondents that the schooner was guilty of negligence in attempting to cross the bows of the steamship. What they insist is, that the schooner, inasmuch as she was on her starboard tack when the steamship approached, should have put her helm up, and gone round on the lee side of the steamship. Difficulty might have attended that manoeuvre, as the purpose was to despatch the yawl with the pilot on board to the lee side of the approaching vessel; and, if the schooner had followed the yawl on the same side of the steamship, she might have become unmanageable, as in a calm; or, if the wind continued to fill her sails, she might have run down the yawl, or have prevented the yawl from reaching her precise point of destination.
 
 
 26
 Opposed to that suggestion, it is maintained by the libellants that the manoeuvro of the schooner was in all respects correct, and the most judicious which could have been adopted. Gross fault, it is clear, was committed, either by the steamship or by the schooner. If the manoeuvre of the schooner was correct, then it is clear that the steamship ought to have stopped, and backed, if necessary, to prevent her from making headway, to enable the schooner to despatch the pilot in safety and without danger to the steamship.
 
 
 27
 Reasonable doubt upon that subject, it would seem, cannot be entertained by any one having much nautical experience; and it would seem to follow, if the steamship might, under the circumstances, continue to make headway, that if was bad seamanship for the schooner to attempt to cross her bows, as the attempt, under such circumstances, would expose her in every case to the danger of collision.
 
 
 28
 Neither party controverts these propositions; but the libellants contend that it was a gross error on the part of the steamship to starboard her helm at that moment, and that it was her duty to have stopped, and backed if necessary, so as to have given the schooner a safe opportunity to despatch the pilot to the steamship, without danger of being run down by the forward movement of the steamship. Apart from that, they also insist that it was proper and customary that the schooner, after she had despatched the pilot, should cross the bows of the steamship and proceed to her windward side, in order to pick up the yawl, under the stern of the steamship, as she moved forward from where she stopped to receive the pilot.
 
 
 29
 Support to that theory is also attempted to be drawn from the danger, if a different course should be pursued, that the yawl and the schooner would become separated in the darkness, to the great peril of the seamen sent in the yawl to assist in despatching the pilot. Extreme difficulty attends the solution of the question, as nothing is found in the sailing rules enacted by Congress to assist in determining which theory is correct. Questions of the kind, if presented in the admiralty court of England, would doubtless be submitted, in the first instance, to the Trinity Masters for their consideration and advice; and it cannot be doubted that much aid would be derived, in such an investigation, from the experience and nautical knowledge of such a board of judicial assistants: but the acts of Congress, regulating the practice and proceedings of the district courts sitting in admiralty, have not nade any provision for any such board of assistants, to sit with the district judges, in the adjudication of such controversies. Nor do the rules regulating the practice of the admiralty courts, as framed by this court, make any such provision. Parties litigant, however, are allowed in such controversies to call and examine persons of nautical skill and experience as expert witnesses; and they may, if they can, prove by them what the general usage is in respect to any disputed question of navigation not controlled by the sailing rules prescribed by Congress; and in certain cases, where better guides are not furnished by law, they may inquire of such witnesses what is and what is not good seamanship in a supposed state of the case, if the supposed state of the case is within the general scope and range of the evidence submitted for the consideration of the court. Nor is such a course of investigation without its advantages, even as compared with the foreign system, as it secures to the parties the right of cross-examination, which is always a right of great value, and more especially so where the witness is allowed to give his opinion to influence the judgment of the court in determining the merits of the controversy.
 
 
 30
 Valuable aid, also, is sometimes obtained, in such an investigation, by referring the cause to a special master, or masters, of nautical experience, with power to examine witnesses, and to report the facts to the court. Such a proceeding, though not specifically authorized by law or the rules prescribed by this court, cannot be considered irregular, as the power of final decision is still in the tribunal to which the report is made.
 
 
 31
 Expert witnesses were examined in the case. They testified to the effect that the pilot-boat, in such cases, approaches directly ahead of the steamship; that the steamship makes either side of her the lee side, as under the circumstances is most convenient; that the steamship indicates the place on the lee side where the pilot may come on board by suspending a bright light over the lee side at the proper place, down near the water; that the steamship then stops, to enable the small boat to approach the side of the steamship, and to allow the pilot to ascend the stairs without danger. When asked why it was that the pilot-boat went ahead of the steamship, the witnesses answered that it was because they could see both sides of the ship, and that they might conveniently pick up the yawl on the lee quarter of the steamship.
 
 
 32
 Among others, the pilot who was despatched to the steamship was examined. He testified that it was customary to get directly ahead of the steamship before dropping the yawl; that it is pretty difficult to overtake the steamship unless she stops still; and that there would not have been any collision if the steamship had stopped, as she should have done. Mosly, another pilot, testifies, that, when they first see the steamship, the pilot-boat shows a flash-light, and that the steamship, in reply, shows a blue light or rocket; that the pilotboat advances nearly ahead of the steamship; and, if the white light is shown over the lee side of the steamship, the pilotboat drops a small boat, with a pilot on board, and that those manning it pull for the steamship, heading for the white light suspended over the lee side, which should be down near the water; and they all concur that the steamship, after showing the light over her lee side, should remain without headway; and some of them add, that, if she changes her position, it is at her own risk.
 
 
 33
 They all agree, except the master of the steamship, that the manoeuvres of the schooner were correct; but he insists that the schooner should have put up her helm, dropped the yawl, and run down under the lee of the steamship. His testimony supports the theory of the respondents; but the great weight of the evidence is the other way.
 
 
 34
 Both of the courts below decided against the respondents; and the court here is of the opinion, that the usage, as proved in the case, warrants the conclusion that the course pursued by the schooner, under the circumstances, was correct.
 
 
 35
 Viewed in the light of these suggestions, the court here concurs with the Circuit Court, that it is impossible to say that the collision was in any degree due to the want of a masthead-light on the schooner, or to negligence on the part of those in charge of her navigation: on the contrary, it is clear that the steamship is guilty of both charges preferred against her by the libellants. She improperly starboarded her helm after the yawl was launched, and she continued to advance; whereas she should have stopped and backed, if it was necessary to back, to prevent any forward movement. Decree affirmed.