# THE HAVERTON.[1]

## DEVERE and others *v.* THE HAVERTON.

### (*Circuit Court, E. D. Louisiana.* January 28, 1887.)

**1. COLLISION—MUTUAL FAULT—DIVISION OF DAMAGES.**

In a case of collision on the high seas, between a steam-ship and a pilot-boat, the steam-ship was held to be in fault for not having and maintaining a proper lookout, and because her officer in charge absented himself so long a time from his proper position on the main-bridge, during which the collision occurred; and the pilot-boat was held to be in fault for not carrying a white light at her mast-head, visible all around the horizon, and in not exhibiting a flare-up light or lights at short intervals while she was cruising, and in not taking any precautions by way of unlashing her helm, and calling the watch below, when it became apparent that the collision was imminent,—all of which faults of both vessels contributed to the collision, and therefore the damages were divided.

**2. SAME—PILOT-BOATS.**

When a pilot-boat is cruising, looking, or waiting for ships wanting pilots, although hundreds of miles off the port to which it belongs, it is a "pilot-vessel, engaged on her station on pilotage duty," within the meaning of article 9 of the act of congress approved March 3, 1885, (chapter 354, 23 St. at Large.)

Admiralty Appeal.

*John D. Rouse* and *William Grant,* for libelant.

*James McConnell,* for claimants.

PARDEE, J. This cause came on to be heard on the transcript of record, and was argued, whereupon the court finds the following as the facts in the case:

(1) About half past 2 o'clock on the morning of the sixth of November, 1885, the steam-ship Haverton collided with and sunk the schooner or pilot-boat Mary and Catharine at a point off the coast of New Jersey, about 22 nautical miles easterly from Absecom light-house, and about 75 miles southerly from Sandy Hook. The night was dark, but clear, so that there was no difficulty in seeing ships' lights properly exposed. No light-houses nor coast lights were in sight. The wind was light, and from the S. S. W. The sea was smooth, except there was considerable swell from the south-west.

(2) The schooner Mary and Catharine was a New York pilot-boat of 38.64 tons burden, about 64 feet long, and for some time prior to and at the time of the said collision she was cruising in above vicinity, hove to on the starboard tack, under double reefed main and foresail bonnets off the jib and stay-sail, the stay-sail sheet hauled to windward, and the helm lashed amid-ships, under a headway of about two knots an hour, leeway not appearing, on a course S. by E. ½ E.

(3) The Mary and Catharine had on board four New York pilots, a crew of one seaman, one boat-keeper, one cook, and two young men rated as boys. The watch on deck was supposed to be made up of one pilot (Stoffreiden) and one boy, (Peterson,) but, as a matter of fact, Stoffreiden was below, lying down, and Peterson was keeping the watch. Peterson was 21 years old, and had been following the sea for nine years. All the rest of the people aboard were below, and asleep.

[1] Reported by Joseph P. Hornor, Esq., of the New Orleans bar.

(4) The Mary and Catharine, before and at the time of the collision, carried one green and one red side light, set and burning. Her mast head-light was aloft, but in a cage, so that it made no show of light but was ready to be used.

(5) From 15 to 20 minutes before the collision Peterson discovered the green light of the steam-ship Haverton on the port and lee quarter, and he thereupon called the pilot on watch from below, who came on deck, and with the glass observed the green light, pronouncing the coming vessel to be a steamer; and soon after observing a white mast-head light apparently just being hoisted up.

(6) Upon the continued approach of the steamer, Stoffreiden, about 10 minutes prior to the collision, took the binnacle light, and showed it in the direction of the steamer. This binnacle light was in a square lantern, with glass on three sides, one a bull's eye, and tin on the fourth, which was the door. The bull's eye was about three inches in diameter. The bull's-eye light not attracting the steamer's attention, Stoffreiden had a torch lighted, and shown towards the steamer by swinging around, and this was kept up from about four minutes prior to and until almost the moment of collision, when the torch was put out, and the steam-ship ineffectually hailed.

(7) The course of the Mary and Catharine was not changed, nor was the condition of her sails and helm altered, after the discovery of the steam-ship, and prior to the collision, nor was the course of the steam-ship altered or changed during that time.

(8) The steam-ship struck the schooner with her starboard bow, just abaft the schooner's fore rigging, with such force as to knock her around on the other tack, and doing such injury that she sunk very soon, giving barely time to get out her boats for her men to escape; and as it was, for some unexplained reason, one boy was neither awakened nor called, but was left to go down with the schooner.

(9) The boats from the schooner pulled in the direction the steamship had taken, but, failing to find her, made towards the land until next morning, when they were picked up by another pilot-boat, and carried to New York.

(10) The pilot-boat Mary and Catharine, a few days previous, had left New York on a business cruise, and at the time of collision was under weigh on a cruise in pursuit of employment as a pilot-boat. The New York pilot grounds extend within a radius of 16 miles off Sandy Hook. The only station that New York pilot-boats appear to have is off Gedney's channel, to take pilots off outward bound vessels. New York pilot-boats cruise for business hundreds of miles off Sandy Hook.

(11) The propeller Haverton was a British steam-ship, built of iron of 2,500 tons, was over 300 feet long, and 40 feet in beam. She was thoroughly furnished with all appliances known and necessary for successful navigation, and fitted up with necessary machinery, including an electric telegraph from the main bridge to the engine-room, and with steam steering and reversing apparatus, and was well officered, manned, and equipped.

(12) The Haverton left the port of New York at 5 P. M. of the fifth day of November, 1885, in ballast, bound on a voyage to New Orleans. After passing Sandy Hook, she took her course by compass S. by W., which was the proper course for the voyage, and continued such course, without interruption or deviation, until 2:30 A. M. of the morning of the sixth of November, when the collision aforesaid occurred, up to which time her rate of speed was $10\frac{1}{4}$ knots per hour.

(13) The Haverton was provided with two observation and lookout bridges, both elevated above the deck, and running across the ship. The rear and main bridge was over the deck engine-house, and was over and just forward of the wheel-house, and was the general and proper station of the officer of

the deck. The forward one was 36 feet abaft the stern, was 7 feet above the main deck, and was 5 feet in width, with a railing around, except at the steps which led down forward, and this was the station of the lookout on watch.

(14) The Haverton carried the regulation green and red side lights, and a white mast-head light, swung by halliards to and under the fore-top gallant stay, about 40 feet above the deck, and just over the stern railing of the forward lookout bridge. The halliards hoisting this light, and the guys staying it in place, all run to said lookout bridge. The light itself was in a lantern, with glass sides, and the whole in a cage properly screened, and weighing 42 pounds.

(15) At the time of and just prior to the collision aforesaid, the second officer of the Haverton was on watch as officer of the deck, and a lookout was stationed on the lookout bridge. These two, with the man at the wheel and two sailors, one of whom was working his passage out to New Orleans, constituted all of the watch on deck. One of these last-mentioned sailors had been at the wheel up to 2 o'clock, but had been relieved, and was charged with no special duty. The other one was aiding in looking after the lights. The captain was in his room asleep.

(16) Just prior to the collision, and to the time that the Haverton was discovered by the watch on the pilot-boat, the mast-head light of the Haverton was reported out of order, smoking, and the glass dim. Thereupon the second officer left the main bridge, and went forward to examine the light. He ordered it down, and cleaned, and thereupon the light was lowered to the deck. Some waste was procured from below, the glass cleaned, and then the light was ordered hoisted back. All the watch observed these proceedings with the light. To hoist the lamp back, at least two men were necessary,— one for the halliards, and one to attend the guys; whereupon the second officer directed the lookout to attend to the guys, saying he himself would keep the lookout. Under this direction, the light was hoisted, the lookout attending to the guys, although not leaving the bridge, but the halliards fouled when the light was nearly to its place, by which time the collision occurred.

(17) While the said halliards were being cleared, the second officer of the Haverton discovered the Mary and Catharine by the exhibition of her flare-up light right under the bluff of the bow of the Haverton. He immediately went back to his station on the main bridge, and telegraphed to the engineer to reverse the engines, and go full speed astern, which order was obeyed. In the meantime the schooner had been struck, and passed astern, out of sight, answering no hails, though several were made from the steamer.

(18) While the said mast-head light was being looked after, the seaman of the watch, who had been relieved from the wheel, and charged with no particular duty, stood on the starboard side of the deck, forward of the lookout bridge, near the rail, and was more or less looking out forward. He saw no lights nor schooner until the schooner was close under the bow of the Haverton, but he did see more or less of the operation of lowering, cleaning, and hoisting the mast-head light on the Haverton.

(19) At the time, and just prior to the collision, there was no person on the Haverton solely charged with the duty of keeping a vigilant lookout, nor any person who kept a continuous vigilant lookout. The regular lookout, prior to his being temporarily relieved by the officer of the deck, had been paying attention to the operation of regulating the mast-head light; and, when the officer of the deck relieved him, that officer was still charged with his deck duties, and did still keep an eye to the execution of his orders in regard to the mast-head light.

(20) As soon as the engines of the Haverton were reversed, the captain, aroused thereby, came on deck, and made ineffectual search with glasses for the schooner. He then had the helm of the steam-ship put hard a-port, and

the ship steamed slowly round in a half circle, looking for the schooner and crew. This until the steam-ship's head came around to the north, when the helm was put hard a-starboard, until the ship's head came around to S. S. E. Still, seeing and hearing nothing of the schooner or crew, the captain concluded that no damage had been done, and resumed his course. By the collision the Haverton was not damaged so much as by a discernible mark.

(21) The Haverton was in fault in not having and maintaining a vigilant lookout, and because her officer of the deck absented himself for so long a time prior to the collision from the main bridge, where he could have exercised vigilance, and could have communicated instantly with the engineer and the helmsman.

(22) The schooner Mary and Catharine was in fault in not carrying a white light at her mast-head, visible all round the horizon, and in not exhibiting a flare-up light or flare-up lights at short intervals while she was cruising as hereinbefore described; and she was also in fault in not taking any precautions, by way of unlashing her helm, and calling the watch below, when it became apparent, as it did, that she was not observed by the Haverton, and that a collision was imminent. And all of the said faults of both vessels contributed to the collision, because it cannot be said, under the evidence, that, in the absence of any one of them, the collision would not have been avoided.

(23) The value of the schooner Mary and Catharine, at the time she was lost, was $5,025, and the property and personal effects at the time on board of her, all of which were a total loss, were of the value of $1,032. The libelants were the owners of said schooner, and are authorized to sue for and recover for said personal effects.

And the court finds as conclusions of law:

(1) That both vessels were in fault, as described in the twentieth and twenty-first findings of fact aforesaid, and the damages resulting from the afore described collision should be divided.

(2) The libelants are entitled to a decree for the one-half the value of the said schooner, and for one-half of the value of the property and effects thereon, as found in the twenty-second finding of facts, to-wit, for the sum of $3,028.50.

(3) The libelants should recover from the claimant the costs of the district court, and should be condemned to pay the costs of this court.

In explanation of the foregoing findings, it is proper to say that I have included some apparently irrelevant details attending the collision aforesaid, because proctors requested findings on those points, and seemed to lay stress upon them. That it was the Haverton that collided with and sunk the pilot-boat I can have no doubt, under the circumstances of the case. The time, the place, the character of the schooner, the matter of lights, and many other incidents appearing in the evidence are conclusive to my mind. It would, indeed, be a singular fact if at the same precise time, in the same neighborhood, there were two New York pilot-boats cruising without lights and adequate watches, in a happy-go-lucky manner, and each at the same time should collide with a large steamship, having defective lights, and no vigilant lookout, and with the same result in each case, a ghostly schooner under the bow, immediately disappearing in the darkness, and apparently from the face of the waters. I have made no point on the Haverton's defective mast-head light as a fault, because the presence or absence of the mast-head light did not affect the ability of the watch on the pilot-boat to discover the Haverton in season. The said light was certainly the center of observation on the

Haverton, and naturally so. The unusual operation of taking it down, and cleaning it, would naturally relieve the tedium and routine of the mid-watch, when no one was anticipating danger.

The careless shape in which the pilots put their boat, and went below to sleep, shows how reckless of danger such men become. In the way of ships, sails set, helm lashed, no lights but side lights, which do not show astern, and a boy (in their own estimation) on watch! The whole case leaves an impression on my mind that the witnesses are mistaken as to the time elapsing between the discovery of the Haverton and the collision, and between the collision and the sinking of the pilot-boat. The Haverton's rate of speed was 10¼ knots, and that of the pilot-boat, in the same general direction, 2 knots; so that, if Peterson saw the Haverton 20 minutes before she came up, she must have been nearly three miles off, and Stoffreiden, coming at once on deck, could hardly have seen at that time and distance a point or two between her masts. And it seems to me that in that time good seamen, as all pilots ought to be, would have called some of the watch below, and made some preparations for handling the schooner in an emergency. And, if there was a period of 15 minutes after the collision before the schooner sunk it would seem that there would have been time to call all hands from below, and have made some signals to the Haverton from the stock on board the schooner. And in that length of time the Haverton should not have lost all sight of the schooner, if she had been floating.

If we take it that Peterson did not discover the Haverton until she was near enough for him to plainly see her green light, and that Stoffreiden was asleep when called, and came hastily on deck, and that the collision immediately followed, sinking the schooner within two or three minutes, all the surroundings of the case are harmonized, and we can understand why the schooner, having no light astern, was not sooner seen; why she was not put under control; why she was deserted so speedily, leaving a man asleep on board; and why the Haverton saw no more of her. Under the facts, as found, there can be no doubt about the fault of the Haverton. She was bound to have a vigilant lookout, and an efficient officer of the deck. When the two were merged, she had about half of each, and that was at the critical time for the pilot-boat. That the pilot-boat should have been put under control when the Haverton was found to be approaching, and not left so that she could not be speedily handled in an emergency, seems equally clear. All vessels are required to use reasonable diligence to avoid collisions.

In cases of collision, a fault of one vessel will not excuse any want of care or diligence in another to prevent damage to herself. "In a cause of collision, the plaintiff, in order to recover entire damages, must prove both care on his own part, and the want of it on the part of the defendant." See *The Clara*, 102 U. S. 202. As to the leaving the helm lashed in cases like the present, see *The Transit*, 3 Ben. 192; and also Mars. Coll. 366.

In an almost identical case, so far as the cruising of the pilot-boat is concerned, a pilot-boat was held by the supreme court to be on a cruise

in pursuit of employment as a pilot-boat, and as such, under the old rule, required to carry a mast-head light. See *The City of Washington,* 92 U. S. 31. It is true that in that case the omission to carry such a light was excused, but it was on the ground that, as the pilot-boat was seen by the approaching vessel in time, such fault did not contribute to the collision. The New York pilot-boats do not appear to have fixed and definite stations, but they cruise hundreds of miles off the port of New York for business. When such pilot-boat is so cruising, looking or waiting for ships wanting pilots, I think it clear that she is a "pilot vessel, engaged on her station on pilotage duty," within the meaning of article 9 of the act of congress approved March 3, 1885, (chapter 354, 23 St. at Large.)

In commenting on the English rule, which is identical with ours, Marsden says:

"It is submitted that a pilot-vessel is on her station on pilotage duty, within the meaning of this article, and required to carry the white mast-head light alone, not only while actually engaged in putting a pilot on board a ship, but while she is cruising on her station, either for the purpose of supplying pilots, or taking them out of ships." Mars. Coll. 334.

In all the cases of collision that have come under my observation, where vessels have been properly excused for not carrying all the regulation lights, the excuse has been on the ground that, as the delinquent vessel was seen in time, or conclusively could not or would not have been seen, notwithstanding the delinquency in lights, such delinquency did not contribute to the collision. If in the present case the watch on the schooner had not discovered (as the witnesses say) the Haverton long before the collision, but had first discovered her close by, (as I am inclined to think was the real fact,) and the Haverton had proved a vigilant lookout, the learned proctors for libelants in this case would no doubt (and with strong grounds) have claimed that the Haverton was grossly in fault for not keeping constantly displayed a bright white light, as high above her deck as the beam of the ship, sufficiently strong to be seen, in a clear dark night, a distance of five miles; but as their case is, no fault is claimed on that score, for, except as it distracted the attention of the watch on deck, it cut no figure in the collision.