THE LA CHAMPAGNE.[1]

SEWALL et al. v. THE LA CHAMPAGNE.

COMPAGNIE GENERALE TRANSATLANTIQUE v. SEWALL et al., (two cases.)

*(District Court, S. D. New York. July 31, 1890.)*

COLLISION—MUTUAL FAULT—SUPPOSED PILOT-BOAT—NOT SLOWING—LIGHTS MISTAKEN AND DEFECTIVE.

The steam-ship La Champagne, while on one of her regular voyages from Havre to New York, and when about 25 miles south of Shinnecock light, on the Long island coast, at about 5 o'clock A. M., collided with the schooner Belle Higgins, bound from a southern port to Bath, Me. The evidence for the schooner was to the effect that she first made the steamer's white light on her starboard bow, then the red light nearly on the starboard beam. Thereupon she showed a torch-light to the steamer, and then another, and afterwards fired a gun, notwithstanding which the collision ensued. The steamer's testimony was that, when the schooner's torch was seen

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

ahead, or a little on the steamer's port bow, they supposed it to be the signal-light of a pilot-boat; and, wishing a pilot, the steamer exhibited a torch in reply, and altered her course a point-to starboard, but without slackening speed of 13½ knots. At the time when the schooner's gun was heard, a faint green light became visible for the first time, whereupon the engine was reversed, and the helm put hard a-port, but too late to avoid collision; and a low intermittent white light was said to have been also seen a little above the torch-light. *Held*, that the steamer was not justified in mistaking the schooner for a pilot-boat; but, if so, it was still her duty to check her headway nearly to a stop, and that her continued high speed of about 13½ knots was a fault; and that, as to the schooner, the supposed angle of collision in the night-time is uncertain evidence, and that the weight of evidence was that the steamer was coming up within the range of the schooner's green light, and not astern of that range; but that the green light was so dim as not to be visible to the steamer within the distance necessary to avoid her; and for this fault the schooner was liable. The damages were therefore divided, including towage services supplied by the steamer.

In Admiralty. Suits for damages by collision.
*Owen, Gray & Sturgis*, for Sewall *et al.*
*Coudert Bros.*, (*E. K. Jones*, of counsel,) for the La Champagne.

BROWN, J. The above libels grow out of a collision which occurred a little after 5 o'clock of the morning of the 25th of February, 1889, in the Atlantic ocean, about 25 miles south of Shinnecock light, between the French steamer La Champagne, and the three-masted schooner Belle Higgins. The stem of the steamer struck the schooner on her starboard side forward of the forerigging, and cut off the starboard bow, so that she filled in a few minutes. Being loaded with lumber, the schooner did not sink; and was left adrift until a tug was sent by the steamer to her assistance, by her master's request, as the steam-ship claims, for whose towage service the steam-ship company afterwards paid. The third libel is to recover for this payment. The other libels are for damages to the respective vessels, the owners of the schooner claiming $40,000 for the schooner, cargo, freight, personal effects, and the salvage expenses; the steam-ship company claiming damages to the amount of $35,000. At the time of the collision the weather was tolerably clear. It had been foggy during the night previous, and the steamer was going at a somewhat reduced speed,—about 13½ knots, under 45 revolutions, instead of 54, her full speed. She was on one of her regular trips from Havre to New York; and, on taking soundings off Long island, while on a course of west true, about 3 o'clock A. M., the instrument having unexpectedly indicated but 16 fathoms of water, her commander ordered her headed one point more to port until half past 5. The schooner was bound from Darien, Ga., to Bath, Me., and was sailing N. N. E. magnetic; the wind, as she claims, being light from the S. W., giving her a speed of about three knots. Her contention is that the steamer's white light was first seen well off on the starboard bow, several miles distant; afterwards the steamer's red light, nearly on her starboard beam; that, as the steamer continued to approach, showing no change, the mate in charge of the schooner, being in doubt whether the steamer was in range of his green light, exhibited a torch-light on the starboard side of the mainsail, which illuminated all her sails; that, the steamer's red and green lights having become visible, and no change appearing in her course, the master was called on

deck, and another torch-light shown, both colored lights of the steamer being then visible, and alleged to be aft of the range of the schooner's green light; and that a gun was soon afterwards fired, but that the steamer continued following up the schooner apparently under a port helm, and, very soon after the firing of the gun, struck her as above stated; that the schooner made no change in her course, and that her side lights were properly burning; and that the collision was caused by the negligence of the steamer in not properly observing the schooner, and keeping out of her way. The case made by the steamer is that, while going as above stated, with competent officers on the bridge, and three competent and attentive persons on the lookout, the first notice of the schooner was a torch-light, seen either ahead or a little on the port bow, and at times an intermittent white light a little above the torch-light; that no green light on the schooner was seen or was visible; that the officers of the steamer supposed the torch-light shown to be that of a pilot-boat, and, being in want of a pilot, they exhibited a torch-light in reply, which was followed by another torch-light shown by the schooner, which was interpreted by the steamer as an agreement that the pilot would come aboard; that the white light, being seen not much above the torch-light, and intermittent, was supposed to be a considerable distance off; and that the steamer's head, in order to facilitate the pilot in boarding her on her port side, was put one point more to starboard, but without slackening speed. A while afterwards the discharge of the gun was heard, the flash of which showed the schooner very near, and about the same time a faint glimmer of a green light was seen. When the gun was heard the engine was reversed full speed, and the helm put hard a-port. The collision occurred soon thereafter, the steam-ship changing her head meantime two or three points to starboard. The distance of the vessels apart, when the gun was fired and the engine reversed, is variously estimated by the witnesses at from 100 meters to half a mile. From the amount of the steamer's change to starboard, the distance, I think, could not be less than from 1,000 to 1,500 feet. The weight of testimony is that at the moment of collision the steamer was heading towards the bow of the schooner, and forwards, at an angle of from $3\frac{1}{2}$ to 6 points.

1. In my judgment the evidence does not show facts on the steamer's part sufficient to justify her in taking the Belle Higgins to be a pilot-boat at a long distance off, and in therefore continuing on at the unabated speed of $13\frac{1}{2}$ knots until she was so near as to render collision unavoidable. If the bearing of the pilot-boat when the torch-light was seen was a point on the steamer's port bow, as the steamer's officers say, no doubt the schooner's green light ought to have been seen distinctly. But a torch-light without any colored light was not sufficient to indicate a pilot-boat. In the absence of a white mast-head light, the torch would mean only that the steamer was overtaking another vessel astern of the range of her colored lights. There was no light on the schooner that could possibly present the appearance of the white mast-head light required of pilot-boats by the rules of navigation.

The low, faint, and intermittent light said to have been seen by some of the steamer's witnesses a little above the torch-light was so different in brightness and in position from the light required to be carried by pilots at the mast-head that it was itself an indication of the need of caution in approaching, instead of a justification for continuing on at almost full speed. The only white light possible to have been seen by the steamer was the cabin light, visible, if at all, through the schooner's skylight. The low, faint glimmer of such a light, familiar to seamen, cannot be deemed to have been justifiably confounded with a pilot's masthead light, without a total discredit of the propriety of the eleventh and nineteenth rules of navigation,—a discredit which I am not prepared to admit. But if the schooner was justly mistaken for a pilot-boat, the steamer cannot be justified for her continued high speed. As I have said, the absence of the usual high bright light was of itself an indication of the need of caution. Her distance could not be exactly known. The pilot-boat might desire to cross the steamer's bow, and come up round her stern, as is sometimes done; and it was the duty of the steamer to check her headway nearly to a stop, and let the pilot-boat do the rest. *The City of Washington*, 92 U. S. 38–41, 11 Blatchf. 487, 6 Ben. 140 ; *The Columbia*, 27 Fed. Rep. 704, 708. It was this failure to check her speed that directly brought about the collision. In the *Case of the Wisconsin*, where a similar mistake was made in regard to a supposed pilot-boat, it was found by the court (25 Fed. Rep. 284) that, "when the steamship was at a safe distance from the bark, her engines were stopped, and her headway was substantially overcome while waiting for the pilot to come along-side in his boat." Had the Champagne's engines in this instance been "stopped when at a safe distance, and her headway substantially overcome," there would certainly have been no collision with the Belle Higgins. The Champagne, on the contrary, for a very considerable time after the flash-light had been twice seen, continued on at the speed of 13½ knots,—four-fifths of her full speed,—until a gun was fired, scarcely a quarter of a mile distant,—her officers estimate the distance much less,—when it was impossible to avoid collision. In this respect I must hold the Champagne to blame.

2. Whether the green light of the schooner ought to have been visible to the steamer depends on whether the steamer was approaching her within range of that light or astern of it. Considerable stress has been laid on the supposed small angle of collision, as sustaining the schooner's contention on this point. But I do not think any great weight can be attached to this evidence, both because the amount of the angle is so likely to be mistaken in the night-time, and on account of the changes in the steamer's heading, and, possibly, in the schooner's heading. Although the wheelsman of the Belle Higgins testifies that her course was held unchanged, it is quite probable that, during the last few moments before collision, her head would be turned to port by the almost irresistible impulse of self-preservation. I find it impossible to reconcile the testimony of her witnesses on this point with the possibilities of the collision. All agree that the steamer was first seen forward of abeam. The

pleadings say, "on the starboard bow." With that simple fact, and with the steamer's speed of $13\frac{1}{2}$ knots, and a course such as to expose her red light only, I find it impossible for the steamer to have got two points astern of the schooner's beam, so as to be out of the range of the schooner's green light, as the witnesses of the latter testify she was. Such a course of approach by the steamer, moreover, would be some three or four points more northerly than the course the steamer testifies she was pursuing, and would also direct her sharply towards the Long island shore. Now, although it is not in itself incredible, considering the previous circumstances, that the steamer might have been heading towards the land for the purpose of making the shore lights, which she had not yet seen, yet all her officers testify in the most explicit terms that they had not taken that course. There are no circumstances to justify suspicion of falsification as to the course that the steamer was going. The reasons for the course taken are stated with a minuteness of detail that carries credit on their face. This course is totally incompatible with the schooner's contention that the steamer came up astern of the range of her own green light after being seen "on the starboard bow," unless the schooner, contrary to her testimony, changed her own course to port, so as to bring the steamer astern of that range by her own action. My conclusion on this head leaves no alternative but to find, as in the *Case of the Wisconsin*, that the schooner's green light was so dim as not to be visible within the distance necessary to avoid her. Had it been visible, it must have been seen by the special watch kept on the steamer. It is not necessary here to decide whether the exhibition of a torch-light to attract attention by a vessel not being overtaken is a breach of the existing rules, —a point on which opposite decisions have been made. *The Merchant Prince*, 10 Prob. Div. 139 ; *The Algiers*, 38 Fed. Rep. 526; *The Nessmore*, 41 Fed. Rep. 437. The new proposed rules would, if adopted, expressly permit (article 12) the exhibition of such a light. But for an insufficient green light the schooner must be held to blame, and the damages and costs, therefore, apportioned. The same disposition is made of the claim for moneys paid out by the owners of the Champagne for the towage services of the tug sent down to the assistance of the schooner. This was done with the knowledge and consent of the master of the schooner, if not at his express request, and he accompanied the tug. It was a proper and necessary act and expense under the circumstances as understood at the time, and it was a direct consequence of the collision, and should therefore be divided, like the other damages.