## Case No. 4,977.

FOSTER v. The MIRANDA.

[6 McLean, 221; 1 Newb. 227.]

District Court, D. Illinois.  Oct. Term, 1854.

Mr. Hurd, for libellant.

Mr. Goodrich, for claimant.

DRUMMOND, District Judge.  This is a libel filed by the owner of the brig S. F. Gale, against the schooner Miranda, for damages sustained by the brig, from a collision with the schooner in the fall of 1849.  The brig S. F. Gale from Chicago with a load of wheat, was proceeding down the lake on her way to Buffalo.  When near the foot of Lake Michigan, off Point Wabbeshanks, not far from the light-ship stationed near that point, about three o'clock in the morning of the 11th of October, the collision took place. The wind was south-south-east.  The brig was close hauled upon the wind with her

1 [Reported by Hon. John McLean, Circuit Justice.]

starboard tacks above, steering nearly east. It was a clear star-light night, and a vessel could be discerned and a brig distinguished from a schooner a mile or more distant. Some time before the collision occurred, the light carried by the Miranda, was seen from the S. F. Gale, two points on her bow.  The man at the helm was ordered to keep the brig clear to the wind, because the light of the Miranda indicated a vessel approaching from an easterly direction.  The brig was accordingly kept as clear to the wind as possible.  The Miranda was bound up the lake, on a voyage from Cleveland to Chicago, and was standing about west by north, and consequently had the wind free.  Some time before the collision those on board of the Miranda had seen the light of the brig, and, believing it a white light, supposed it was a vessel on the same course with themselves, and immediately preceding the collision, the watch on the deck of the Miranda had gone aft to lower the peak, with a view to haul round the light-ship—a usual and proper precaution—the captain being at the helm.  As the two vessels approached, the mate of the brig shouted to those on the schooner, not to run into them.  When this was done the helm of the schooner was put hard-a-port, and that of the brig put down; but the vessels ran so near that at that moment, when apparently for the first time those on each vessel entertained apprehension of a collision, it was impossible to prevent them from meeting, and the Miranda struck the S. F. Gale on the larboard bow near the fore-rigging.  Both vessels were injured, but the brig suffered the most.

By the 5th section of the act of congress of 3d of March, 1849, making appropriations for light-houses, &c., and for other purposes (9 Stat. 382), vessels, steamboats and propellers navigating the northern and western lakes, are required to comply with certain regulations "for the security of life and property," among which are the following:—During the night, vessels on the starboard tack shall show a red light, and vessels going off large or before the wind. a white light; and it is provided, "if loss or damage shall occur, the owner or owners of the vessel, steamboat or propeller neglecting to comply with these regulations, shall be liable to the injured party for all loss or damage resulting from such neglect."  This law is undoubtedly binding upon all the classes of vessels mentioned.  It follows that it was the duty of the S. F. Gale to carry a red light, and of the Miranda to carry a white light at the time of, and previous to the collision.  There was no point made as to the light of the Miranda. Those on board of the brig admit that the schooner showed a white light.  The evidence. however, proves that it was an ordinary globe lantern without reflectors; and if so, it could hardly be said to come up to the standard required by the law:  because I think the words in the act, "said light shall

be furnished with reflectors, &c., complete, and of a size to insure a good and sufficient light," apply as well to the lights carried by vessels as to those carried by steamboats and propellers.

The libel alleges that the S. F. Gale carried at the time a red light. The answer of the claimant denies it, and asserts it was a white light. Of course, the dispute is to be determined by the proof. And here is to be found the conflict of evidence which so often occurs, in these cases between the persons on board of the different vessels. A brief examination will show where the weight of the testimony is upon this point.

Langley, the captain of the brig, merely says they had a red light. Scott, a seaman, states they had a red light on the pall bitts, but he did not notice the Gale's light when he went on deck. It being his watch below at the time, he did not go on deck till the collision occurred. Hitchcock, also a seaman of the brig, who was at the helm, says that at the time the Miranda's light was first discovered, and for more than an hour previous, and up to the time of the collision, the brig showed a red light suspended from the pall post. This is the whole testimony on the part of the libellant. The witnesses simply declare the fact to be so, without adverting to any circumstances which show that their attention was particularly called to it, or that they had any special reasons for recollecting it.

On the other hand Durand, the captain of the Miranda, says that he saw the light of the Gale about fifteen minutes before the collision, a mile or more distant: that it was a white light. He is positive it was a white light, because the second mate and himself had previously talked of it, and there was no other light in sight except that of the light-ship, and he is certain also, because the Gale carried the same light (white) when she shot across the bows of the schooner. Wilgus, the first mate of the Miranda, declares he noticed the signal light of the Gale. It was a white light, but burned low, giving a dull light. He still saw the same light hanging after the two vessels parted. Isaac Brown, the second mate, was one of the watch on deck at the time. He and the captain spoke together of the white light carried by a vessel then ahead of them as they supposed. They stood some time on the forecastle deck and saw a white light and that only. If the Gale had carried a red light, he says, they would not have gone aft to lower the peak of the mainsail, Joseph Brown, a seaman of the Miranda, states the brig had a white light, which burnt dim at the time. The light was so near he could not but observe it; and he says it was remarked by others at the time that the Gale carried a white light. Turner, also a seaman of the Miranda, says that the Gale carried a dim, white light; and is positive it was a white light, because he had heard the cap-

tain and second mate previously talking of the light in sight as a white light, and because, when he found the brig was close hauled on the wind, with her starboard tacks aboard, he noticed that she showed the wrong light.

It is apparent from the foregoing statement of the evidence upon this point, it predominates strongly in favor of the conclusion that the S. F. Gale showed a white light. The witnesses who testify on that side, had their attention particularly drawn to the fact: it was the subject of remark at the time. They saw the light before the collision, and after; their opportunity for observation was favorable, and it seems clear that those on board of the brig who speak to this point were mistaken; or, at all events, the S. F. Gale did not show that kind of light which the law required. There can be no doubt the act demands the exhibition of such a red light (when the vessel during the night is on the starboard tack), as under ordinary circumstances, and more especially in so clear a night as that when this collision occurred, can be distinguished from a green or white light. It is possible the explanation may be found, as has been suggested, in the fact that the S. F. Gale, just before the lightship was passed, had been sailing with the wind free, and her officers had neglected to change their white light when they changed their course. However this may be, I am forced to the conclusion that the brig was not at the time showing the proper light, consequently those who had charge of her were themselves in fault in that respect. There is some doubt, also, whether there was a good look-out kept on board of the brig. The captain of the Miranda says, if a good look-out had been kept on the brig, the collision might have easily been avoided. This might have been so, but those on board of the S. F. Gale had a right to suppose, as they were close on the wind, the usual rule would be observed by the Miranda—to keep away; whereas, as we shall presently see, the course of the schooner was unchanged until the collision was unavoidable. The S. F. Gale not being free from blame, it follows the owner cannot, under the maritime law, sustain a claim for full indemnity for the damage done.

The next question is, whether within the meaning of the act of congress the loss or damage resulted from the neglect of the brig to comply with the requirement of the law, because if that is the case, so far from the Miranda being liable to the S. F. Gale, the latter would be liable to the owner of the schooner for the injury done to the Miranda. And perhaps we cannot better illustrate the principle than by supposing this were a libel filed by the owner of the Miranda against a brig for injury done to the former. Could it be sustained under the circumstances of this case? Conk. Adm. 302. We have to set out with the admitted fact, that

the S. F. Gale violated an express law of congress. In the case of the collision of the De Soto and Luda (Waring v. Clark, 5 How. [46 U. S.] 441), the supreme court went out of its way to decide, that if a collision occurs between steamers at night, and one of them has not signal lights, it will be held responsible for all losses until it is proved that the collision was not the consequence of the absence of signal lights. The court say they do not put the decision of the case on that ground, and they do not determine whether there was an absence of signal lights or not. The real ground of the decision on the merits was, that the Luda was run down whilst in the accustomed channel of upward navigation, by the De Soto, which was out of that for which it should have been steered to make the port to which it was bound. The opinion of the court in Waring v. Clark [supra] was given under the act of 7th July, 1838, which made it the duty of the master and owner of every steamboat running between sunset and sunrise, to carry one or more signal lights. It is said this principle applies also to the act of 1849 which we are now considering, and that the Miranda cannot be accountable for any loss to the S. F. Gale, until it is shown it was not occasioned by the brig carrying a white light.

Did the collision happen in consequence of the neglect of those who had charge of the brig? It may be admitted that the fact of the brig not having the proper light throws upon the libellants the onus of proving the damage was the result of some fault on the part of the Miranda. I have come to the conclusion, after an attentive examination of the evidence, that while it may be said the collision might not have happened if the brig had shown the right light, it may also be said it would not have occurred if there had not been fault on the part of the Miranda. It is insisted, if it be proved that the brig violated the law, it follows as a necessary consequence that the Miranda must stand excused. I do not so understand the law. There are certain rules which are settled in the maritime law, respecting the conduct of vessels at sea, but the neglect of these by one party will not excuse the other for the want of ordinary care and diligence. In a recent case, it seems to be implied that every proper precautionary measure must be taken on the part of the collided vessel to pass the other in safety; and then if a loss happen in consequence of the fault of the other, the damage is attributable to the neglect of this last. Newton v. Stebbins, 10 How. [51 U. S.] 605. And see St. John v. Paine, 10 How. [51 U. S.] 55, and The Cynosure [Case No. 3,528].

If the S. F. Gale showed the wrong light, it was not the less the duty of those on the Miranda to observe the usual nautical rules in the management of their schooner. It was not the intention of the act of congress to abrogate those regulations which have always been observed in the management of vessels. Notwithstanding the brig carried a white light, it was the duty of the Miranda, having the wind free, to keep away, and not to hold on her course. It was a clear starlight night, those on the Miranda had a right at first to presume that the brig was on the same course with themselves. But if it be true as stated, that the captain and mate of the Miranda looked at the light of the S. F. Gale for some time, they must have seen that they were overhauling the vessel ahead at a very rapid rate. It is to be borne in mind that the evidence shows the two vessels were approaching each other at the combined speed of from eight to ten miles an hour. It should have been enough to have excited to watchfulness. The law of congress is obligatory, but so are all the laws of the sea. There have been many rules and regulations established by the wisdom and experience of nautical men and sanctioned by the courts, for the conduct of vessels, but there is none of more imperative obligation, than the one which declares that when a vessel is approaching another in the night a competent and vigilant look-out should be kept on board of each. It is a rule prescribed alike by the law, and by common sense and common prudence. Did the Miranda keep such a look-out? It seems to me not. According to the evidence the officers knew they were approaching a vessel. What if it was a vessel on the same course with themselves? They were not the less bound to be vigilant in looking out for her and watching her movements. I concur entirely in the opinion of one of the nautical witnesses examined in court, Capt. Napier, that even if they had supposed the vessel ahead was on the same course with themselves, still it was their duty to keep a good look-out, and to call all the watch on deck to lower the peak, at a time when they were so near another vessel. It is impossible to escape the conclusion that if this had been done, in so clear a night as that was, it would soon have appeared that the brig ahead was in fact approaching them from an opposite course close hauled on the wind, notwithstanding the white light, and thus the collision might have been avoided. It was also the duty of the schooner, having the wind abaft the beam, to keep away. It seems clear that if the Miranda had had a competent watch at the time, and kept away as she ought to have done, no collision would have taken place. The loss that was sustained was not the result altogether of the neglect of the brig to show the right light, and was not the consequence alone of that neglect, but to say the least it was occasioned in a measure by the neglect of those in the Miranda. I find, therefore, that the two vessels were each in fault.

But it is urged, conceding there was a fault on the part of the Miranda, yet it was not such an omission as that of the brig.

The latter had violated an express law, by neglecting to do that the omission of which no circumstances could excuse, and it is not like other rules, which vary according to contingencies. I cannot yield my assent to this doctrine. The law of congress under particular circumstances requires a particular light. The maritime law requires a vessel under certain circumstances, to be managed in a certain way. Both are equally binding upon those who have the charge of vessels. And I think that is a sound rule, which, if sustained and enforced by the courts, conduces, to the greatest extent, to unremitting vigilance on the part of seamen. The doctrine laid down by Dr. Lushington in the case of The Hope, 1 W. Rob. Adm. 154, seems to be founded in good sense, and may be applied to this case: that if the brig carried the wrong light, and the master of the Miranda should say, "we will keep our course nevertheless," he would be to blame. It would be a dangerous doctrine, to authorize the master of the Miranda to say under the circumstances of this case: "That vessel has the wrong light; I will not trouble myself to avoid her: the consequences be upon herself."

Both vessels then being in fault, the next inquiry is how is the loss to be apportioned? The rule laid down by Lord Stowell in the case of The Woodrop Sims, under his second possibility by which a collision may occur, when both parties were to blame, or where there is a want of due diligence on both sides, is, that the loss must be apportioned equally between them as being occasioned by the fault of both. This seems to be the well settled doctrine in the English admiralty, and is the general rule of the maritime law. Story, Bailm. § 608; Abb. Shipp. (Shee's Ed.) 230-223, pt. 3, c. 1; Conk. Adm. 300. It has, however, been said in the argument, that the rule has never been adopted in this country. No case was cited in which the doctrine has been applied by a court of admiralty in this country, and it is certainly singular, in the many cases which have arisen, there are so few in which the fault has been found to be common to both parties, so as to determine what the rule is in such cases. But the doctrine to divide the loss appears to have been approved, and whenever it is referred to, it seems to be considered as a part of the maritime law to be administered by our admiralty courts. Story, Bailm. ubi supra; 3 Kent, Comm. 231, 232. It is treated as settled law by Judge Hopkinson in Reeves v. The Constitution [Case No. 11,659]; by Judge McKinley in Strout v. Foster, 1 How. [42 U. S.] 92; and by Judge Woodbury in his separate opinion in Clark v. Waring, 5 How. [46 U. S.] 503. And it was expressly decided and applied by the district court of Massachusetts in 1846, and treated as the settled doctrine in admiralty. Rogers v. The Rival [Case No. 11,867], and authorities there cited. And see the case of The De Cock [5 Mon. Law Mag. (Notes of Cas.) 303].

It is admitted that the rule in the common law courts is different, but all the text writers and judges who have mentioned the subject, seem to regard it as a fixed rule in admiralty. And on the whole, though it has sometimes been considered objectionable by able judges and writers, yet after some reflection I am satisfied the strength of the argument, reasoning upon general principles, is in favor of the rule, and sustains the authorities, in spite of a sneer that has occasionally been thrown out of its being rusticum judicium. It is safer to adopt this rule in cases of collision, than it is to measure out to each party in a particular case, the precise quantum of damage that he may have sustained.[2]

As the parties wish me to decide the question of damages on the proof now in, without referring it to a commissioner, I will state my views on the subject. The evidence is that the S. F. Gale was injured to the amount of $336, for which repairs were actually made and about that amount paid. The other damage is stated by the captain at $300. One of the witnesses puts it from $300 to $500. They do not give all the particulars of the injury, from which the court might ascertain with accuracy the amount. It is stated that the new fore-sail was worth $40 more than the old. On the whole I have thought that $600 would, under the proof, be a fair amount to fix upon as the damage sustained by the S. F. Gale. The witnesses say that the damage done to the Miranda was $300. The whole damage done by the collision was then $900, one half of which would be $450. The S. F. Gale being injured $300 more than the Miranda, I shall order a decree to be entered against the claimant and his sureties for $150, and that divides the loss equally between the parties. I shall allow costs to neither party; each one must therefore pay his own.

---

[2] The rule has since been sanctioned by the supreme court. The Catharine v. Dickinson, 17 How. [58 U. S.] 170.

