## THE BUCKEYE.

(*District Court, N. D. Illinois.* December 12, 1881.)

1. COLLISION—LIGHTS.

   The fact that the libellants' boat did not display the lights required by law is no defence to an action for damages by a collision, when the want of lights did not cause or contribute to it.

2. CHICAGO RIVER—NEGLIGENCE.

   *Semble*, that it is negligence for any craft to navigate the Chicago river, between the Main-street bridge and Allen's slip, during the season of navigation, and when the stream is crowded with other craft either moving or moored to the bank, at a greater rate of speed than three miles an hour.

In Admiralty.

*Schuyler & Kremer*, for libellants.

*W. H. Condon, R. S. Tuttle,* and *Mr. Mitchell,* for respondents.

BLODGETT, D. J. This is a libel by the owners of the steam canal-boat Montauk against the steam-propeller Buckeye, for damages by a collision in the waters of the south branch of the Chicago river, between the Buckeye and the Montauk, on the evening of August 19, 1880, whereby the Montauk was sunk and her cargo proved a total loss to its owners.

Norton & Co. file the libel in their own behalf, as owners of the Montauk, for the damages and demurrage sustained by them as such owners, and also in behalf of the insurance company who had issued a policy to them upon the cargo, and who have paid for the cargo as a total loss. The claim on the part of the libellants is that the collision was occasioned by reason of the negligent handling of the Buckeye while she was proceeding down the river; while the respondents, the owners of the Buckeye, insist that the collision was wholly occasioned by negligence on the part of those in charge of the Montauk. It appears from the proof, and is undisputed, that the collision occurred in the river near the south line of Allen's slip, where the river is about 130 feet wide from dock to dock; and on the part of the libellants it is claimed that the Montauk was on the west side of the center of the river, and within 15 or 20 feet of the west bank; while on the part of the respondents it is contended that the Montauk was, by reason of the negligence of those in charge of her, in the middle or east of the middle of the river at the time she was struck by the Buckeye. The undisputed facts in the case are that between 7 and 8 o'clock of the evening in question the steamer Buckeye was coming

down the river, passing through the west draw of Main-street bridge. When in the draw her officers heard a single blast of a whistle from the Montauk, which was then coming up the river, indicating that the Montauk would keep on her starboard side, which was the west side of the river. The Buckeye responded with one whistle, indicating that she would keep upon her starboard side, or the east side of the river going down. The Buckeye kept on down the river, and when just at the south line of Allen's slip, about 700 feet below the bridge, the bow of the steamer struck the port bow of the Montauk about three feet from her stem, injuring her so severely that the Montauk was hauled into Allen's slip, where she sunk within half an hour. It is conceded that the Montauk had no lights displayed at the time of this collision, and it is contended on the part of the respondents that the negligence of the Montauk in not displaying the lights required by law, and also the fact that the Montauk was not upon her side of the river, or not close enough to her own side of the river, caused the collision; and that those in charge of the Buckeye were not guilty of any such negligence as should make her liable.

The law requires vessels navigated by steam to carry the lights required by law in all weathers, between sunset and sunrise. Rule 2, § 4233, Rev. St. And it is clearly shown by the proof, in fact admitted, that the collision occurred after sunset, and that the Montauk had no lights.

But it is contended on the part of the libellants that the collision in this case did not occur by reason of the want of lights on the Montauk; that it was still sufficiently light to enable those in charge of the Buckeye to see the Montauk plainly, and to have taken timely measures to have avoided the collision. And it is undoubtedly well settled that the mere fact that the lights were not burning on the Montauk, as required by law, is not a defence here, unless this fact caused or contributed to the collision. *The Tillie,* 13 Blatchf. 514; *The Miranda,* 6 McLean, 221; *The Farragut,* 10 Wall. 334; *The Dexter,* 23 Wall. 69; *The Wanata,* 95 U. S. 600. The position of libellants is that, even if it was after sunset when the collision occurred, it was still light enough so that those on the Buckeye could plainly see the Montauk, and should have seen her in time to avoid a collision; and if they negligently failed to do so, they cannot successfully invoke the fact that the Montauk was violating the statute law in regard to signal lights. In other words, the question in this case is, does the testimony, when all considered, satisfy the mind that

the collision would probably have occurred, even if the lights had been properly set and burning upon the Montauk at the time?

The chief contradictions in the testimony are as to the precise moment of the collision, and the degree of light at that time; the time being in fact immaterial, except so far as it bears upon the question as to the amount of light at and immediately before the collision. The witnesses on the part of the Buckeye insist, some of them, that it was "pitch dark," others that it was "very dark," and others that it was "thick dusk" at the time the collision occurred. While, on the part of the libellants, the witnesses state that it was "light;" that it was "clear light," "not dark;" that objects like the Montauk could be seen a long distance,—some say a mile, others say half a mile, others say several blocks, but all insisting that it was light enough for those on the Buckeye to have seen the smoke of the Montauk at the time the two boats respectively sounded their whistles for their sides of the river, and when they must have been about 900 feet apart. It is possible that, owing to a bend in the river, the hull of the Montauk may not have been visible from the deck of the Buckeye while in the draw of the bridge, but her whistle was heard and her smoke could have been seen.

From a very careful review and analysis of this testimony, I have come to the conclusion that it was light enough for those on the Buckeye to have seen the Montauk, long enough before the collision occurred, to have shaped their course so as to have avoided the collision. That it was not "pitch dark" nor "very dark," nor even dim daylight or dusk, is evident from the respondents' own witnesses. Many of them who testify to this intense darkness seem to have been able to observe objects in every direction except that in which the Montauk lay; and even the lookout upon the Buckeye says that when he discovered the Montauk she was 200 feet or more away, and that he did not report her to the captain, who was the officer of the deck, because the captain could see her himself. The river at the place where this collision occurred, for a long distance above and below it, is very crooked, and it is no doubt incumbent on tugs and other vessels moved by steam to proceed either up or down the river very cautiously. The evidence in the case satisfies me that the Montauk was going quite slowly and the Buckeye going very fast. Those in charge of the Buckeye say she was going from three to five miles an hour. Witnesses differ very much as to the rate of speed of the Buckeye, but the established fact, if anything may be said to be established by

this proof, is that the Buckeye proceeded down the river nearly 700 feet after sounding her whistle to indicate which side of the stream she would take, while the Montauk progressed up the stream only about 200 feet in the same time. The witnesses on the Montauk and those upon the shore, or on other vessels in the vicinity, say she was not going over two miles or two and one half miles per hour. If her speed was two, or two and one half miles, certainly the Buckeye must have been going over six miles an hour at the time, because she covered within the same time more than three times the distance passed over by the Montauk.

As to the question whether the Montauk was in the middle of the river, or east of the middle of the river, as is claimed by the respondents, I think the preponderance of the proof shows that she was west of the middle of the river. The proof shows that the barge Irish lay upon the west side of the river, just north of the entrance to Allen's slip,—far enough north, so that her jib-boom and forward hamper did not interfere with the entrance to the slip. In going up the river, the Montauk, having in tow the canal-barge Lockport, was obliged, of course, to swing out from the west bank of the river far enough to avoid colliding herself or her tow with the Irish, and this would carry her towards the middle of the river,—the river, as I have said, being there about 130 feet wide. After the Montauk had passed the Irish she would naturally, as she intended to go through the west or starboard draw of the Main-street bridge, which she was approaching, hug closely to the west or starboard side of the river, and I can see no evidence that she did otherwise. It is possible that she was very near the middle of the river; because, to avoid the Irish, she would have to swing nearly or quite into the middle of the stream, and she might not have regained the west side, as she had only gone a little more than her length beyond the Irish just before the collision, and when her captain saw the Buckeye coming onto her, the wheel of the Montauk was undoubtedly put further to port for the purpose of throwing her still further over to the starboard side of the river; and, from the manner in which the two vessels came together, there can be no doubt, I think, that the bow of the Montauk was bearing towards the west or starboard, so as to present her port bow to the Buckeye. And the proof also shows that immediately after receiving the blow the Montauk swung around crosswise of the river, so that she reached nearly across the river, and the fact that she did thus swing crosswise of the river from the impetus of the blow or collis-

ion, convinces me that she received the blow in such a manner as that her bow must have been west of the center of the river; otherwise her stern would have struck the east bank before she swung around squarely across the river. Besides this, I can see no reason or motive for the Montauk being upon the east side of the river. The proof clearly shows, by the testimony of witnesses on both sides, that the officers of the Buckeye knew that the Montauk was going up stream, and that she had given them the signal, to which they had responded, as to the side upon which she would come. Between the Main-street bridge and Allen's slip there is a bend in the river which somewhat obscures the view in a direct line to a person standing upon the docks; but a man standing upon the bow of a steamer like the Buckeye, which was running light, with her bow high out of water, on account of her machinery being in her stern, could undoubtedly have seen the Montauk plainly from the time the Montauk sounded her whistle, and, even if he did not see her, it was not by reason of the darkness of the night, but by reason of the bend in the river and the lumber piled on the deck. He had notice that she was there; that she was coming up the river; and that she would be upon the starboard side of the river; for her whistle had told him all this. It was, therefore, his duty to go slowly and cautiously; and more especially was it his duty, if, knowing that the Montauk or any other steamer was coming up the river, he was unable, by reason of the crookedness of the river, to see her, to go very cautiously. The crooked river and even the approaching darkness imposed additional caution upon those in charge of the Buckeye, and they should have gone more moderately, should have slackened speed, and, if necessary, stopped; but, instead of doing so, it would seem from all the proof that the Buckeye was going down the river at a rate, as I have said, of six or more miles an hour, where the river was so crooked that it was extremely difficult to see objects more than a few hundred feet ahead, which, under the circumstances, can be called little short of recklessness. As a rule, I think, it may be said to be negligence for any craft to be moving in that part of the river faster than three miles an hour during the season of navigation, and when the stream is crowded with other crafts either moving or moored to the docks; but whatever may be the rate or speed, the craft should be completely under control, so that she can be stopped, or her course changed promptly.

But the captain of the Buckeye says that when he discovered the

Montauk, instead of shutting off steam and reversing, if necessary, he put on additional steam, hoping to swing his steamer, as he says she was then swinging, to starboard more rapidly, so as to avoid collision with theMontauk. Granting that he did not discover the exact locality of the Montauk until just as he was turning the bend above Allen's slip, which I can hardly believe to be true, he could then have stopped before striking her if he had promptly reversed his engine. I cannot avoid the conclusion that the conduct of the master of the Buckeye savors strongly of recklessness in the speed with which he was going down the river, and the maneuvers which he adopted to avoid a collision after he says he discovered the Montauk. I have carefully looked over the proof, and considered whether this is a proper case to divide the damages, but can see no evidence of mutual negligence. The only ground for it is the assumption that the Montauk was on the east side of the river, which I do not think sustained by the proof. The proof in the case, when carefully considered and analyzed, satisfies me that this collision did not occur later than 7:30 o'clock in the evening. The sun set that night at 6:53, so that it was, at most, only a little more than half an hour after sunset; and this, on a summer night, would not make it so dark, even if it was quite cloudy, that an object as large as the Montauk could not be plainly seen on the water at least twice the distance from the bridge to Allen's slip. The map of that part of the river which is in proof in the case shows that it is over 700 feet from the west draw of the bridge to the point where the collision occurred, and that even if the Buckeye steered directly over to the east side or to the east half of the river immediately after passing through the draw, she would have a plain view of the whole river to a point below Allen's slip as soon as she reached a point opposite the mouth of the gas-house slip, and she would then be over 400 feet above the point of collision, and probably 500 feet away from the Montauk. Let any one interested in the solution of this question of fact, as I have been ever since I have heard this case, notice from evening to evening the amount of light remaining, even in a cloudy evening, and at this season of the year, for 30 or 40 minutes after sunset, and I think he can hardly avoid the conclusion that there must have been on the evening of August 19, 1880, ample light at 7:30 o'clock to have enabled those on the Buckeye to have seen and avoided the Montauk. The night or evening was not phenominally cloudy or dark, but merely an overcast or cloudy evening.

I come, therefore, to the conclusion that the collision in question

was not contributed to or caused by the absence of lights, but that it was occasioned by the negligence of the master and those in charge of the Buckeye. The exception to the commissioner's report will be overruled, and a decree entered in accordance with the findings of this report.