## THE LORD O'NEILL.

### THE PEERLESS v. EASTON & McMAHON TRANSP. CO. et al.

(Circuit Court of Appeals, Fourth Circuit. February 5, 1895.)

#### No. 101.

COLLISION—RESPONSIBILITY OF VESSEL IN GREATER FAULT.

The tug P. was proceeding up Chesapeake Bay with four barges in tow. The night was dark but clear, and all the lights of tug and tow were burning brightly. The steamship L., which was proceeding down the bay at full speed, at a distance of nearly or quite half a mile to the westward of the tug, when nearly abreast of the tug, suddenly, and without apparent reason, changed her course, and ran into and sank the first barge. Before the steamer's change of course there was no reason to apprehend a collision, and, after such change, there was no way of avoiding it. The tug, on observing the steamer's change of course, sounded a danger signal. The only fault attributed to the tug was her failure to give the passing signal, which her captain testified he omitted because he did not think the steamer was within half a mile of him. *Held*, that the gross and culpable negligence of the steamer was the proximate cause of the injury, and that she should be charged with the whole damage, the omission of the tug to give the passing signal being so slight a fault, under the circumstances, and contributing so little to the disaster, as not to be entitled to consideration.

Appeal from the District Court of the United States for the District of Maryland.

This was a libel by the Easton & McMahon Transportation Company against the steamship Lord O'Neill and the steam tug Peerless, to recover for the loss of libellant's barge. The district court found both vessels in fault, and ordered the damages to be divided. The claimants of the Peerless appeal.

Robert H. Smith, for appellant.

Henry Stockbridge, Jr., for Easton & McMahon Transp. Co.

J. Wilson Leakin, for the Lord O'Neill.

Before GOFF and SIMONTON, Circuit Judges, and BRAWLEY, District Judge.

BRAWLEY, District Judge. The steam tug Peerless, having in tow four barges laden with coal, was proceeding up the Chesapeake Bay on the night of the 6th of July, 1893, when at a point abreast of the mouth of the Potomac river, at about half past 9 o'clock, the British steamship Lord O'Neill, going down the bay, col-

lided with and sank the barge Mamie A. Brady, one of the barges in tow, the owner of which has libeled both tug and steamship. The court below, holding both to be at fault, has adjudged that the damages be divided, and from this decree the owners of the Peerless have appealed. There has been no appeal on the part of the steamship. In the opinion of the district judge, "the steamship was evidently grossly in fault." The only fault alleged against the tug was her failure to sound the passing signal as required by rule 6 of regulations prescribed by the supervising inspectors of that department, which is as follows:

"The signals, by blowing of the steam-whistle, shall be given and answered by pilots, in compliance with these rules, not only when meeting 'head and head,' or nearly so, but at all times when passing or meeting at a distance within half a mile of each other, and whether passing to the starboard or port."

In cases of collision, where there is conflict of testimony, the opinion of the district judge upon questions of fact should be, and nearly always is, controlling, for he has had the advantage of seeing the witnesses face to face; and where, as in the case before us, the district judge is uncommonly careful, learned, and conscientious, it is with regret that we find ourselves compelled to a different conclusion. Inasmuch as the testimony of one important witness was taken in the circuit court of appeals, subsequent to his decree, it may be that his judgment would have been different had this witness been examined before him. Be that as it may, we cannot find in the record sufficient proof of fault upon the part of the tug Peerless to render it liable for one-half of the damages, while we do find such manifest, culpable, and inexcusable negligence on the part of the steamship as to render it responsible for the entire loss. The testimony shows that the tug was moving at the rate of about three miles an hour against the tide, the barges being towed with a hawser astern the Peerless, the Mamie A. Brady being the leading barge in the tow, the Roselle, the Wister, and the Frank Thomson following in the order named, in a straight line. The length of the hawser between the Peerless and the Brady was about 420 feet, the other barges following and being from 300 to 350 feet apart. It is satisfactorily established that the night, though dark, was clear, and a good night for seeing lights, and that all the lights upon the tug boat and the barges were burning brightly. The master and lookout on the tug, and the masters of all the barges, all agree substantially that they saw the masthead and red lights of the steamship a long way off, and well on to their port bows. The master and lookout of the tug, and the master of the second barge, testify that, if the steamship had not changed her course, she would have passed them at least a half mile to the westward. From the testimony of the masters of the other barges, it would appear that the distance was not so great. However that may be, the conclusion is irresistible that, up to the time when the steamship was nearly abreast the tug, she was at such a distance to westward that if she had kept her course there would have been no danger of collision, for all the witnesses agree that up to that

time her port light only was visible. Had she been approaching the tug head on, or nearly so, some of the witnesses on the tug or barges would have seen both port and starboard lights. They were watching her from the time she was three miles off until she came about abreast of the tug, and all that time she showed only her red light.

Two witnesses only were examined in behalf of the steamship,—the pilot and the third mate. The lookout was not produced. The pilot was over 70 years of age, and very deaf. The mate was 22 years old. It is impossible to gather from their testimony any intelligible explanation of the cause of the collision. In contradiction of all the other witnesses, they claim that the night was hazy and rainy, and that just before the collision a squall came up, shutting out all lights. If this were true, then the steamship could not be acquitted of gross negligence in going at full speed along a route where vessels of all kinds were frequently passing and repassing; but the overwhelming weight of the testimony seems to be against this contention, and we are compelled to give preferable credence to the witnesses examined in behalf of the tug. From their evidence certain leading facts seem to be established. They are: First, that with respect to lights no fault is imputable to tug or tow; second, that the steamship, from the time she was first observed until she was nearly abreast of the tug, was moving on a course which, if continued, would have carried her well off to the westward of the tug and tow, at a distance from them of from 300 yards to a half mile; third, that, when nearly abreast the tug, the steamship, going at the rate of nine and one-half knots an hour, about her full speed, for some unaccountable and inexplicable reason, changed her course abruptly and rapidly, and moved down on the barge, striking her with her starboard bow; fourth, that prior to that sudden change of course there was no reason to apprehend collision, and after such change there was no means of avoiding it; fifth, that after the change of course, the tug did all that could be done by blowing a danger signal and stopping.

The only fault charged against the tug is the failure to blow the passing signal, as required by rule 6, when passing "head and head," or when vessels pass within half a mile of each other. The master of the tug says that he did not give this signal, because he did not consider the steamship to be within a half-mile distance. The lookout on the tug gives like testimony as to the distance, and Williams, the master of the second barge, says that "if the steamship had not changed her course she would have passed them at least a half mile." Inasmuch as the steamship likewise failed to blow the passing signal, it may be assumed that she did not consider herself within the half-mile distance. If the testimony on this point is sufficient to raise a doubt as to whether rule 6 was applicable, this would eliminate every possible ground upon which the tug could be held liable. "Where a fault is charged against one vessel in relation to which the testimony is doubtful, and there is undisputed testimony as to the fault of the other, which is flagrant, the former vessel will not be charged with contributory neg-

ligence." The Manistee, 7 Biss. 35, Fed. Cas. No. 9,028. But we will not let our decision rest upon so narrow a margin. If it be true, as found by the district judge, that the steamship was "grossly in fault," and if it be true, as we find, that the immediate cause of the injury was the inexplicable and culpable change of course by the steamship after she came abreast of the tug, the omission to blow the passing signal bears so little proportion to the flagrant faults of the steamship, and contributed so little to the disaster, that it is not entitled to consideration. The proximate cause of the injury is the first and main question to be determined in fixing and apportioning the liability, and finding, as we do, that the immediate cause of the collision was the change of course after the tug was passed, the misconduct of the steamship is not alleviated by proof of some omission to do an act which had no direct connection with such misconduct. Where fault is clearly shown on one side, full proof should be required to shield from liability the party guilty of such fault, and it should appear that the alleged contributory negligence had, or probably might have had, something to do with the act which produced the injury. The object in requiring the whistle to be blown by vessels approaching each other within a certain distance is obviously to notify of the approach, and to give notice as to which side they will pass. If that knowledge is obtained in any other way, the office of the signal is accomplished. In the case before us the steamship had passed the tug at a safe distance. The collision was due, and solely due, to her failure to observe the two bright white lights, which, by the exigency of section 4233 of the Revised Statutes (rule 6), a towing vessel is required to carry vertically at her masthead, and the lights upon the barges, all of which, according to the testimony, were burning brightly, and to the sudden change of course upon the part of the steamship. The blowing of the passing signal by the tug could not have informed, and was not intended to inform, the steamship that the tug had the barges in tow. It could not have prevented the change of course or checked the speed of the steamship, which was the primary and immediate cause of the collision, and therefore did not contribute to it. In Perkins v. Hercules, 1 Fed. 925; The Margaret v. The C. Whiting, 3 Fed. 870; The Buckeye, 9 Fed. 666,—it was held that the failure of the sail vessels to show lighted torches, as required by section 4234 of the Revised Statutes, did not relieve the steam vessels colliding with them, after sunset, from liability. See, also, The Farragut, 10 Wall. 334. The facts in this case readily distinguish it from The Connecticut, 103 U. S. 710, and The Manitoba, 122 U. S. 97, 7 Sup. Ct. 1158, cited in support of the decree of the district court. It is therefore ordered that the said decree be reversed, and the case remanded to the district court, with instructions to enter a judgment against the steamship Lord O'Neill for the entire loss occasioned by the collision, and for the costs.