PERMANENTE STEAMSHIP CORPO-
RATION, a corporation, Libelant,

v.

THE American Steamship COLORADO,
her engines, tackle and appurtenances;
States Steamship Company, a corpora-
tion; Doe Company; Doe Corporation;
John Doe I, John Doe II and John Doe
III, Respondents.

STATES STEAMSHIP COMPANY, a cor-
poration, in its own behalf as owner
and operator of the SS Colorado, and
as bailee of cargo laden thereon, Libel-
ant,

v.

THE American Steamship PERMA-
NENTE SILVERBOW, her engines,
boilers, tackle, apparel and appurte-
nances; Permanente Steamship Corpo-
ration, a corporation, Doe Company,
Doe Corporation and John Doe, Re-
spondents.

Nos. 26749 and 26767.

United States District Court,
N. D. California, S. D.

Feb. 21, 1955.

Thelen, Marrin, Johnson & Bridges,
Gordon Johnson, San Francisco, Cal.,
Derby, Cook, Quinby & Tweedt, James
A. Quinby, San Francisco, Cal., for li-
belant in Case No. 26749 and for re-
spondent and claimant in Case No.
26767.

Lillick, Geary, Olson, Adams & Charles,
Gilbert C. Wheat, Edward D. Ransom,
San Francisco, Cal., for States Steam-
ship Company.

ROCHE, Chief Judge.

Action by libelant, owner of the Amer-
ican Steamship Permanente Silverbow,
against the respondent, owner of the
American Steamship Colorado, for dam-
ages sustained by the Silverbow in a
collision between the two vessels in the
alleged amount of $475,000. The owner
of the Colorado in a separate action,
claims against the Silverbow for dam-
ages to the Colorado in the amount of
$275,000. The two actions were consoli-
dated.

The facts are as follows:

On the evening of January 1, 1954, a
few minutes after 9:00 P.M., the Silver-
bow, southbound, a steel cargo vessel of
the "Victory" type, about 439 feet in
length, with a gross tonnage of 7606
tons, and the Colorado, northbound, also
a steel cargo vessel of the "Victory"
type collided at a point twelve miles off
the coast of California in the vicinity of
Fort Bragg. The Silverbow was bound
from Portland, Oregon to San Francisco
without cargo; the Colorado was bound
from San Francisco to Vancouver, B. C.
laden with 3,200 tons of cargo.

The sea was calm. There was little
or no wind, current was negligible, and
although the night was dark, visibility
was excellent.

Both vessels were being navigated by
their junior third mates, each of whom is

an experienced mariner and holds a master's license. Mr. Corrigan was the mate on watch on the Silverbow and Mr. Fabri was the mate on watch on the Colorado. The captains of both vessels had retired, having left appropriate night orders, and neither captain was on the bridge when the collision occurred.

On each vessel the only man on watch on the bridge, in addition to the mate, was the helmsman. A lookout was on watch on the bow of both vessels, each of them having relieved the preceding lookout about five minutes before 9:00 P.M.

Seven miles directly ahead of the Silverbow, proceeding south on a heading of 159° was the tanker SS Macgaregill.

The libel of the Silverbow, filed January 22, 1954, describes the events leading up to the collision as follows:

Shortly before nine o'clock, the mate of the Silverbow sighted the white masthead light of the northbound vessel, which later proved to be the Colorado, directly ahead at an estimated distance of five miles. The vessels proceeded directly toward each other until the mate of the Silverbow could see both colored side lights of the Colorado. Observing the masthead and range light of the Colorado to "open" or draw apart, in such manner as to indicate a change of that vessel's course to her own right, the mate of the Silverbow also gave way slightly to the right to a compass course of 175° true, after which each vessel had a relative bearing off the port bow of the other. Instead of maintaining its course and thus effecting a routine port to port meeting, in which each vessel shows its left side to the other, the Colorado then altered its course to its own left and crossed the bow of the Silverbow about one mile ahead of that vessel. As soon as the mate of the Silverbow saw the green, or right hand side light of the Colorado cross his bow from left to right, and appear off his starboard bow, he gave way slightly to the left and returned to a compass heading of 160° true, after which the two vessels were situated to pass

safely starboard to starboard, each presenting its right side to the other.

Instead of carrying out and completing this maneuver the Colorado, when almost abreast of the Silverbow, turned sharply to its right, and its bow struck the starboard or right side of the Silverbow at approximately a right angle at a point about ninety feet from the stern. A few seconds before the collision which occurred about 9:05 P.M., the wheel of the Silverbow was ordered hard left in an effort to avoid the Colorado, but the maneuver had little or no chance to take effect, swinging the vessel a mere five degrees to the left to a compass heading of 155° true at the time of impact.

The Colorado's libel, filed February 9, 1954, does not contain a detailed statement of facts, but makes the assertion that while the Colorado was proceeding northward, the Silverbow "ran into and collided with her." However, the Colorado's brief contains the following statement as to the occurrences leading up to the collision:

The Silverbow was on its true course of 160°, and the Colorado on its true course of 340°, and were in the status of "meeting vessels." After seeing the Colorado's white light, the Silverbow mate saw both colored side lights of the Colorado dead ahead of the Silverbow at a distance of about 3½ miles. Shortly thereafter the Silverbow mate saw only the red running light of the Colorado. The Silverbow then changed course 15° to the right coming from course 160° to course 175°. After sighting the white light of the Silverbow the Colorado next saw only the red running light of the Silverbow. The Colorado then properly went to her right changing course from 340° to 350°. The ships still appeared to be drawing too close, so the mate of the Colorado came to 360° to allow more room. The Silverbow then turned left from 175° to its base course of 160°. When the Colorado reached 360° the seriousness of the Silverbow's left turn became evident to the Colorado mate. Confronted with this situation, the Colorado mate decided to accentuate his

right swing to give as much room as possible to the Silverbow if she should try to correct her erroneous turn to the left. The Colorado mate ordered full astern on his engines at the same time that he ordered hard right.

The issues in this case are entirely factual, and the court is in the position of having to decide which of the two different accounts given, is the true one, i. e., (1) either the Colorado crossed the bow of the Silverbow at a converging angle from the Silverbow's left to the Silverbow's right, and then, when completely free of the Silverbow's course, and with each vessel showing its green right side light to the other, executed an abrupt hard right maneuver bringing her bow into the starboard side of the Silverbow, or (2) the vessels were at all times approaching each other on opposing courses, and the Silverbow made an unwarranted turn to the left across the known and expectable path of the Colorado.

Testimony of eleven members of both ships' companies was introduced in evidence. Of these, only two actually appeared in person, Captain John M. O'Brien, master of the Silverbow, and Charles F. Corrigan, mate of the Silverbow.

Pursuant to stipulation both sides agreed that the transcript of testimony given by the other witnesses at the preliminary investigation of the collision held by the United States Coast Guard could be introduced into evidence. As to the Colorado, no witnesses who were aboard her at the time of collision appeared in person at the trial of this case.

The key witnesses in this case are the two men who were on watch the night in question, that is, Fabri on the Colorado, and Corrigan on the Silverbow. There is a basic conflict in their stories which must be resolved in favor of one or the other. Corrigan took the witness stand, and gave, in this court's view, an account of the night's occurrences which, when considered in the light of the entire record, is credible.

On the other hand Fabri's testimony is, in this court's view, confused and highly unreliable on many important happenings of the evening in question. For the purpose of showing Fabri's poor recollection and knowledge of what occurred the evening of the accident, it is pertinent to catalogue Fabri's testimony concerning events as he remembered them occurring between 8:30 P.M. and 9:06 P.M. In doing so the questions have been paraphrased for purpose of brevity, and arranged in chronological order, but the answers quote the exact words of Fabri:

I. *Macgaregill and Colorado*

"Q. How long after you came on duty did the blip of the Macgaregill appear on the radar? A. I am sorry, I can't recall the time.

"Q. It was at least 25 minutes after you came on duty? A. I wouldn't fix any time, I don't remember, I didn't look at the clock, I don't remember.

"Q. Do you recall the range of the Macgaregill on the radar—what was the distance? A. No sir, I don't.

"Q. How long after the blip of the Macgaregill appeared on the radar did any lights appear? A. Again I have no recollection of time * * *

"Q. Can you tell approximately what time it was when you picked up the lights of the first vessel that you saw—the Macgaregill? A. No, I am sorry, I can't.

"Q. How long after 20:20 was it that you gave the order to come to 350°? A. Again I can't remember, I didn't look at any clock.

"Q. How long after the Macgaregill's lights first appeared did you give the order to come to 350° easy? A. Again, I have no recollection of time.

"Q. How long did the Colorado stay on the 350° course in passing the Macgaregill? A. I don't know.

"Q. How long was it after you saw both of the side lights of the

Macgaregill that you swung so that the green light went out? A. I can't remember, sir.

"Q. Do you know the approximate time that the Macgaregill passed you abeam? A. No, sir, I can't definitely say.

"Q. How long after you gave the order to come back to 340° easy, after passing the Macgaregill, was it that the helmsman reported he was steady on 340°? A. Again I have no recollection of the time."

## II. *Silverbow and Colorado*

"Q. Do you recall whether you saw the lights of the Silverbow before the lookout reported it? A. I don't recall, no sir.

"Q. How long after you saw the white light of the Silverbow did you determine that it was a ship? A. Again, time I have no recollection of.

"Q. When you saw the red light of the Silverbow and gave the order to go to 350°, had your clock struck two bells for 9 o'clock at that time? A. I don't recall.

"Q. How long was the red light of the Silverbow visible to you? A. That again, I cannot say.

"Q. When you gave the order to go to 360° were the range lights of the Silverbow open? A. It was so quick—I can't remember it now.

"Q. At the time you gave the order to go to 360°, was the red side light of the Silverbow in your view? A. That again, I cannot answer, we were swinging, his range and masthead were changing, and I can't answer correctly, I truly don't know.

"Q. What period of time elapsed between the time when the relative angle on Exhibit S–S last prevailed and the time when the relative angle on Exhibit S–T came into existence? A. I cannot give you the time— things happened so fast, I cannot tell you the time.

"Q. When you made the log entries at 10:45 P. M., how did you determine that you gave the order full astern and stop at 21:05? A. That I cannot remember.

"Q. Did you talk to anyone as to when it was that you had given the order full astern and stop? A. I may have, I don't remember, I just don't recall."

It will be noted that the first grouping of questions refer to the Macgaregill, the ship which was proceeding south about 7 miles ahead of the Silverbow. A short time before the collision the Colorado encountered the Macgaregill, and several maneuvers were necessary for these ships to pass one another. This preliminary encounter of the Colorado and the Macgaregill is pertinent and revealing for it aids in determining whether Fabri, on the night of the collision (1) was standing a careful, alert and observant watch, and (2) was navigating his ship prudently, carefully, and skillfully.

The testimony of Mr. Beck, the mate of the tanker Macgaregill is considered trustworthy by the court. Not only was Beck a disinterested witness, but his testimony is demonstrably corroborated by the Macgaregill's course recorder tape.

He testified that at about 8:30 P.M. he picked up the Colorado upon his radar at 15 miles, 5° off his starboard bow. Beck computed that if neither ship changed course they would pass starboard to starboard 1¼ miles apart. At 8:30 P.M. Beck altered the course of the Macgaregill, giving way to port by 3° from 159° to 156° and remained on this course until 8:45 P.M. By the time that Beck had the Colorado on the 7 mile range of his radar, the Colorado's bearing to the Macgaregill's starboard had increased from 5° to 14°.

Beck then observed the bearing begin to narrow, so that at about 6 miles it had decreased to 10°. Beck exclaimed to his quartermaster that "the ship was about to cross our bow" and concluded that a situation had come about that was not "in favor of the ship I was on, so I therefore, gave her hard right and went to hard right, hard to starboard, to get out of its way." In swinging hard

right Beck changed the Macgaregill's course from 156° to 183½°. Thus it is evident that with the Macgaregill to his starboard, and with plenty of room for a safe passing, Fabri, when the vessels were between 6 and 7 miles away suddenly swung to the right and headed across the bow of the Macgaregill for a port to port passing.

Fabri places the Macgaregill on his port side, thereby justifying the fact that he altered course to the right from 340° to 350°. Beck testified that he had the Colorado 14° to the starboard. Thus when the Colorado started heading toward the Macgaregill, between the 6 and 7 mile ranges on the Macgaregill's radar, the Macgaregill was at least 14° to the starboard of the Colorado, rather than to port.

Fabri testified that the Macgaregill did not alter its course as far as he knew. Beck said that he altered it twice, the second change being in an opposite direction and radical in extent.

Corrigan, aboard the Silverbow which was trailing the Macgaregill, saw it "seem to take off. She took a radical turn to starboard."

Fabri when asked by the Coast Guard Investigating Officer whether the Macgaregill "altered its course", answered, "I don't know, no."

On cross-examination the question was again asked.

"Q. As far as you were able to observe it, did he (i.e., the Macgaregill) at any time, up to the time he passed you, passed the Colorado, change his position? A. Not as far as I know."

The testimony of Beck and Fabri when considered together, leaves little doubt in the court's mind that Fabri was standing an unalert watch and navigating carelessly.

A further aid in evaluating this case is the fact that no entries relating to the circumstances of the collision appear in the rough log-book of the Colorado, with the exception of the meager entry which was made by Fabri at about a quarter to

11 that same night after he had been relieved from his watch at his own request at 10:00 P.M.:

"2105—Full astern and stop."

"2106—collided with vessel Permanente Silverbow."

A log entry similar to the one made by Fabri is commented upon in the case of The Arkansan, 1939 A.M.C. 352:

"It is also significant that no entries relating to the circumstances of the collision appear in the rough log book of the Knoxville City, with the exception of the very meager entry, "5:13 collided with S/S Arkansan. The absence of any entries regarding the circumstances of the collision in the rough log sheet of the Knoxville City tends to discredit the testimony of the witnesses from that vessel on points which are in dispute."

Contrasted to this is the entry made aboard the Silverbow by Corrigan about 15 minutes after the collision:

"0905 off Fort Bragg sighted vessel bearing down on my port side, he was heading West, crossed my bow, then, turned and showed port light and hit at stbd quarter aft."

The official log of the Colorado contains this entry:

"The collision occurred in a crossing situation."

The report of Marine Casualty which the Colorado's master made to the Coast Guard called for a statement as to the cause of casualty, which was answered: "Improper maneuverings by the SS Permanente Silverbow in meeting situation."

When the attention of the Colorado's master was called to the report at the Coast Guard hearing he said that his statement in his report was a repetition of what Fabri told him when he came on bridge immediately after the collision. Quoting the master's testimony, "The Permanente Silverbow had shown him a red light, and he came right with the ship in order to go astern of the Silverbow. The Silverbow then changed its course and crossed his bow and collided, and the collision occurred." On cross examination the Captain of the Colorado

repeated three times that Fabri had told him that he changed course to the right in order to go astern." The "crossing situation" entry in the final log is consistent with the explanation Fabri gave to his master immediately after the collision; the "meeting situation" statement in the report and now advocated by the Colorado is inconsistent with this entry and the statements of Fabri.

Viewing Corrigan's and Fabri's testimony in light of the entire record in this case the issue of credibility is resolved by this court in favor of Corrigan and the Silverbow.

The main attack leveled at the Silverbow consists of two diagrams attached to the brief of the Colorado, accompanied by detailed explanations which are intended to show (1) that the movements attributed to the Colorado by Corrigan could not physically have been performed, (2) that Corrigan's testimony, though honest is mistaken, and (3) that the Silverbow is solely responsible for the collision.

The only two witnesses who took the stand on behalf of the Colorado were Captain William I. Stevens, master mariner, and Mr. Guralnick, naval architect. They participated in an attempt to recreate the right turn of the Colorado. From the data recorded, and information supplied to him, the architect, Mr. Guralnick, plotted the curve of the maneuver.

Under the facts in this case, the tests, and the charts based on those tests, do not impress the court as spelling out in an objective, scientific way, the courses actually taken by the Silverbow and the Colorado just prior to the collision. Mr. Guralnick, who charted the courses of both ships admitted that he never had any previous experience charting the track of a vessel. In addition tests were conducted on only one ship, the Colorado. Mr. Guralnick, therefore, had no data on the turning radius and headway advance of the Silverbow, and so admitted upon examination:

"Q. You don't know what the turning radius of the Permanente was, of the Silverbow was as she turned from 175° to 160°, do you?

A. No, I haven't plotted it."

On cross-examination Mr. Guralnick was asked how many seconds it would have taken from the time the order "come to 160° from 175°" was given to the time the Silverbow steadied on 160°, and he answered "It would take about five seconds." However, he then corrected himself and admitted that execution of the 15° course change by the Silverbow would have taken at least 70 seconds in time and 1800 feet in distance, and then stated, "Mr. Johnson, I haven't given that point very much thought and I am not absolutely sure * * * I am not absolutely sure of the ground I am on in answering that question."

The court is of the view that the decision in this case must rest on the testimony of Fabri and Corrigan as to their basic maneuvers, and on the attending facts and circumstances, and that the conclusions testified to by Mr. Guralnick based on the above mentioned tests and charts are not convincing as to the actual courses pursued by the Silverbow and the Colorado.

The court would like to comment at this point on the diagram depicting the "Colorado's story" attached to its brief. It is indicated in the diagram that the Silverbow made its first turn to the right from 160° to 175° when the vessels were three miles apart. Prior to making this turn, the evidence discloses that Corrigan had first seen both side lights of the Colorado and then only the red light.

Counsel for the Colorado states that on observing the red light of the Silverbow, the Colorado also "properly went to her right from 340° to 350°." The chart indicates this turn to the right, however it also shows that the Colorado did not give way to the right in a timely manner, but rather continued long after it should have on its course of 340°. The important factor, in the court's view, in analyzing the "Colorado's story", is the time when Fabri started his alleged turn to the right. The evidence discloses that the Silverbow gave way to the right when three miles distant from the Colorado.

Fabri's testimony is that he altered his course to the right (from 340° to 350°) immediately after he saw the Silverbow's red light, and that he was then from one to two miles away from the Silverbow. In the court's view Fabri's testimony compels the conclusion that he was not standing an alert watch, and did not see within the time that he should have the red light or any side light of the Silverbow. As a result he started his right turn too late. In addition, by continuing on course 340° until within a mile or at most two of the Silverbow, the Colorado by converging on the Silverbow's course put itself in a position to cross the bow of the Silverbow. Corrigan set the distance at the time that the Colorado crossed the bow of the Silverbow at "say approximately a mile, maybe could be a little more."

It is also the court's view, assuming the right turn executed by the Colorado was justified, that a 10° turn to the right was insufficient under the circumstances. Therefore, even if the court was to accept the story told by the Colorado, Fabri's first maneuver, when he allegedly changed course from 340° to 350°, was too late in time, and insufficient in degree of turn.

After considering all the testimony, the documentary evidence, and the cases cited by both sides, the court concludes that the Colorado crossed the bow of the Silverbow from the left to the right, leaving each vessel free of the other's course, and then with each vessel showing its green side light to the other executed a hard right turn into the starboard side of the Silverbow.

Both the Colorado and the Silverbow have stipulated that neither ship sounded whistles the night of the collision. The Colorado raised the contention during the course of the trial, with an amendment to its pleadings, that the Silverbow was at fault in not sounding her whistle when she returned to her original course of 160° from course 175°. The court is satisfied that the sole fault for this disaster lies with the Colorado, and that the failure of either vessel to sound whistles had no direct connection under the facts of this case with the collision. The Lord O'Neill, 4 Cir., 1895, 66 F. 77. It was Fabri's inattentiveness, and inappropriate maneuvering that caused the two vessels to assume the positions that they did, and under the circumstances, the blowing of whistles would not have, in the court's view, prevented the ensuing collision.

In accord with the foregoing there should be a decree entered for the Silverbow in its suit against the Colorado, (No. 26749), with a reference to ascertain the amount of damage sustained, and the libel against the Silverbow, (No. 26767), should be dismissed.